483 A.2d 6

**Donald THOMAS**

v.

**STATE of Maryland.**

**Nos. 151, Sept. Term, 1982, 44, Sept. Term, 1983.**

Court of Appeals of Maryland.

Oct. 31, 1984.

296

300

Michael R. Braudes and George E. Burns, Jr., Asst. Public Defenders, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on the brief), for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on the brief), for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, DAVIDSON,* RODOWSKY and COUCH, JJ., and W. ALBERT MENCHINE (Retired), Specially Assigned Judge.

MURPHY, Chief Judge.

The appellant, Donald Thomas, was found guilty by a jury in the Circuit Court for Baltimore County of the first degree murders of Donald Spurling and his wife, Sarah. He was also found guilty at the same trial of raping Noel Wilkins, of committing two first degree sexual offenses upon Ms. Wilkins (cunnilingus and fellatio), and of robbing her at knife point of $20. The State having earlier given the requisite statutory notice that it would seek the death penalty for the two first degree murders, the ensuing sentencing hearing resulted in the imposition of the death penalty for Sarah's murder, a life sentence for Donald's murder, concurrent terms of life imprisonment for the rape and first degree sexual offenses, and a twenty-year consecutive sentence for the armed robbery. Thomas appealed, challenging both the guilty verdicts and the death sentence imposed upon him.

For the purposes of appeal, the parties have agreed to the following statement of facts:

---

* Davidson, J., participated in the hearing and in the conference of the case in regard to its decision, but because of illness did not take part in the adoption of the opinion.

"At 4:41 a.m. on October 2, 1981, Officer Joseph Bayer of the Baltimore County Police Department received a call to respond to a reported double rape at 5643 Chelwynd Road, a residence located in Baltimore County. Five minutes later, Officer Bayer arrived at that address. Already on the scene, outside the residence, were two other police officers; a fourth officer arrived almost immediately thereafter. Officer Bayer entered the house through the front door, followed by the other officers.

"Upon entering the house, Officer Bayer observed the body of Sarah Ann Spurling lying on the floor in a doorway between the kitchen and dining room. Ms. Spurling was nude from the waist down with the exception of a pair of panties, the crotch of which had been cut or torn away. Ms. Spurling was found lying in a pool of blood, and the cause of death was subsequently ascertained to be multiple stab wounds.

"Searching the house, the officers encountered two other persons. In the basement, the officers located the body of Donald Lee Spurling. The cause of Mr. Spurling's death was also multiple stab wounds. In an upstairs bedroom, the officers found an 18-month-old child later identified as the Spurlings' daughter Jennie, who was unharmed.

"The State's principal witness was Noel Ann Wilkins. Ms. Wilkins was a student who rented a room from the Spurlings at the time of the homicide. Ms. Wilkins testified that she went to bed at approximately 11:00 p.m. on October 1, 1981. Later that night, she was awakened by Ms. Spurling crying out in alarm; the cry was then cut off. Not fully awake, Ms. Wilkins remained in bed, where she continued to hear 'strange noises' from the downstairs portion of the house.

"According to Ms. Wilkins' testimony, at some point that evening she saw the silhouette of a man pass by her door, and then heard the door to Jennie's bedroom open and close. Her own door was then opened, and a man whom she identified as Appellant entered her room. Threatening her

with what appeared to be a butcher knife, the man tied her hands and forced her to engage in various sexual activities. Specifically, he placed his mouth on her genital area, engaged in vaginal intercourse, and forced her to kiss his penis. He then bound her with a lampcord and asked for money. She told him that there was $20.00 in a candy dish, and he took the $20.00.

"Ms. Wilkins went on to testify that she told Appellant that Donald Spurling would be coming home; Appellant responded 'I have taken care of him.' He asked her about guns, and she told him about a rifle case in the basement. He left to look for the guns. By this point, the bonds on her hands had come loose, and she exited through her bedroom window, climbed down a drainpipe, and ran for help.

"Kelly Gramm, who at that time was living at 5638 Chelwynd Road, testified that at approximately 4:30 or 5:00 a.m. on October 2, she heard Ms. Wilkins calling for help. She invited Ms. Wilkins in, and the latter called the police, stating that she had been raped, that there was still a child in the house, and that 'I think he has killed Sarah.'

"The defense did not dispute that Appellant had stabbed the Spurlings. The defense theory was that he killed Donald Spurling in self-defense when the latter attacked him; killed Sarah Spurling in a frenzied attempt to escape; and that the sexual encounter with Ms. Wilkins was consensual.

"Appellant testified on his own behalf. He related that during the evening of October 1, he was in downtown Baltimore playing video games. From a distance of half a block, he observed a minor traffic accident in which Donald Spurling was involved. Spurling asked him to remain until the police arrived as a witness on his behalf, and he complied. Thereafter, Spurling stated that he wished to pay Appellant for staying but had no money with him. Spurling asked him to accompany him home to obtain some money, and Appellant agreed. On the way, they stopped at the residence of one Sam Houseman, where Spurling demanded

the repayment of a $20.00 debt. Houseman was unable to repay Spurling, and the latter threw him to the ground and beat him.[1]

"After stopping at a bar in Arbutus, Appellant and Spurling proceeded to Spurling's home. Sarah Spurling castigated her husband for failing to pick her up at work and ultimately went upstairs, leaving Appellant and Spurling alone in the kitchen. While there, Spurling stated that he had a 'job' for Appellant to do. It ultimately developed that Spurling was looking for a 'hit-man' to kill someone who had apparently cost him a great deal of money. Appellant responded that he would be willing to fight someone, but not to kill.

"The two proceeded to the basemant, where Spurling showed Appellant his collection of guns and knives, indicating that he would provide a weapon for the 'hit.' They proceeded to watch television and throw darts in the basement, after which they prepared and ate a meal in the kitchen and then returned to the basement.

"At this point, Appellant was under the impression that Spurling was acting and speaking strangely, as if he had been using Quaaludes. The conversation returned to the topic of Appellant killing someone who had 'cost [Spurling] a lot of money.' Appellant decided he did not like Spurling's attitude toward him, and stated that he wished to leave. Spurling said he would go upstairs and get some money from his wife to give Appellant so that he could return home.

"When Spurling returned, he informed Appellant that he could not give him any money, because his wife was still angry and refused to give him any. In lieu of giving him money, Spurling told him that there was a 'chick' upstairs (Noel Wilkins) who 'indulged in having sex with black guys.' He had checked with her, and she was willing to have sex with Appellant. Appellant went up to Noel's room, and they proceeded to engage in sexual relations.

"Appellant then returned to the basement. Spurling removed a knife from a gun cabinet, and again raised the subject of the 'hit job.' Appellant responded that he could not kill anyone and wanted to go home. At that point, Spurling 'toyed with the knife and for no apparent reason he stuck me in my leg.' After Spurling stabbed Appellant, Spurling held the knife pointing inward toward his own chest. Appellant 'pushed it to his chest,' and the knife fell onto a sofa. Appellant grabbed it and ran toward the steps leading upstairs from the basement. Spurling grabbed him, and Appellant, in fear because Spurling had already stabbed him and was much larger than himself, continually slashed him with the knife.

"Appellant then ran back to Noel's room, stating that he was in trouble and asking for money. He then ran downstairs, saw Sarah's body, and realized that he had killed her. (He testified subsequently that he had 'blanked out' after the fight with Spurling and did not remember encountering Mrs. Spurling at all.) He returned to Ms. Wilkins' room for a third time; she voluntarily gave him $20.00 and a pair of jeans to replace his bloody pants. He then tied her up and fled.

"In rebuttal, the State requested that the court call as a court's witness Michael Thomas, Appellant's brother. The State proffered that on October 11, 1981, Assistant State's Attorney Thomas Basham had telephoned the witness to ask him questions about the case, but that he had refused to cooperate. On October 26, the witness recanted a statement given to investigating officers on October 4, during which he related what Appellant had told him after the crime occurred. On this basis, the prosecutors stated that they were unable to vouch for the witness's credibility. Over objection, the court called Michael Thomas as its own witness. During his testimony, the witness read his statement to the jury. That statement indicated that on October 2, Appellant told his brother that he had to kill Mrs. Spurling because she had attacked him. The statement also included Appellant's admission that he had stolen a pair of

diamond earrings and some gold chains, contradicting his testimony that he had not stolen anything from the house.

"Michael Thomas at trial again recanted the statement, testifying that he had given the officers a statement because he had been held at the police station for a long time and needed to tell them something in order to be released.

"1. Appellant testified that he did not strike Houseman at all. Houseman testified that during the altercation, Appellant did in fact punch him."

**(1)**

The appellant first contends that the trial judge (Hormes, J.) improperly precluded him from cross-examining two State's witnesses concerning Donald Spurling's allegedly violent character. During its case in chief, the State called David Bortle, one of the Spurling neighbors, solely for the purpose of identifying the murder weapon. On cross-examination, appellant questioned the witness about Donald's "temperament" and inquired whether the victim was "explosive" or acted "crazy" at times. The court sustained objections to this line of questioning. On the next day of trial, the State called Naomi Ward to testify about Sarah's activities on the night of her death. On cross-examination, the appellant asked whether Donald was "getting into a lot of fights from time to time." Again, the State's objection was sustained. Appellant argues that because he raised the issue of self-defense during opening argument, evidence of the victim's violent character was admissible to prove which of them was the aggressor.

When the issue of self-defense has been properly raised in a homicide case, the character of the victim is admissible for two purposes. *See* Annot., 1 A.L.R.3d 571, 596–603 (1965); 1 *Wharton's Criminal Evidence* § 236 (13th ed. 1972); 1A *Wigmore on Evidence* § 63 (Tillers rev. 1983). First, it may be introduced to prove the defendant's state of mind when the victim was killed. Specifically, the character evidence may be used to prove that defendant had reasonable grounds to believe that he was in danger. *Jones v. State*, 182 Md. 653, 659, 35 A.2d 916 (1944). The accused

may introduce evidence of the deceased's previous violent acts to prove that he had reason to perceive a deadly motive and purpose in the overt acts of the victim. To use character evidence in this way, the defendant first must prove: (1) his knowledge of the victim's prior acts of violence; and (2) an overt act demonstrating the victim's deadly intent toward the defendant. *Gunther v. State,* 228 Md. 404, 410, 179 A.2d 880 (1962); *Jones v. State, supra,* 182 Md. at 659–60, 35 A.2d 916. Second, the violent character of the victim may be introduced to corroborate evidence that the victim was the initial aggressor. *Williamson v. State,* 25 Md.App. 338, 333 A.2d 653 (1975). It is not necessary to prove that the defendant had knowledge of the victim's reputation. *Id.* 25 Md.App. at 345, 333 A.2d 653. To use character evidence for this second purpose, however, the proponent must first establish an evidentiary foundation tending to prove that the defendant acted in self-defense. *Id.* 25 Md.App. at 345, 333 A.2d 653; 1 *Jones on Evidence* § 4:40 at 463–64 (1972); 1 *Wharton's Criminal Evidence,* § 236 at 510–11; 40 Am.Jur.2d *Homicide* § 303 (1968). *See Nixon v. State,* 204 Md. 475, 484, 105 A.2d 243 (1954) (evidence concerning the "quarrelsome disposition" of the victim is properly excluded unless a proper foundation is laid).

Appellant maintains that the testimony about Donald's violent character which he sought to elicit on cross-examination was to be introduced for the second purpose. However, he acknowledges that no evidence supporting his self-defense claim was introduced until he took the stand in his own defense. Thus, no foundation was laid for the introduction of character evidence during the cross-examination of the State's witnesses. Consequently, the trial court did not err in sustaining the State's objection to his line of questioning.[1]

---

1. Because no foundation was laid, it is unnecessary to decide whether appellant's testimony alone would be a sufficient foundation. 1 *Jones*

■ Moreover, the questions asked of the two witnesses concerned subjects far beyond the scope of their direct testimony. It is well accepted that cross-examination ordinarily may only be used to explore the subject matter covered by the witness in his direct examination and for impeachment purposes. *Williams v. Graff,* 194 Md. 516, 522, 71 A.2d 450 (1950). *See also Comm'n on Med. Discipline v. Stillman,* 291 Md. 390, 435 A.2d 747 (1981); *Shupe v. State,* 238 Md. 307, 208 A.2d 590 (1965). David Bortle's direct testimony was limited to an identification of the murder weapon. Naomi Ward, in her direct testimony, gave an account of her activities with Sarah on the evening of the murders. She did not discuss Donald beyond acknowledging that she had met him. Questions about Donald's character were far afield from the direct testimony of both witnesses. Therefore, the trial court's disallowance of this cross-examination was not reversible error.

### (2)

Appellant next claims that the trial court erred when it improperly admitted the expert testimony of an F.B.I. agent during the State's case on rebuttal. In its case in chief, the State had presented evidence that Sarah Spurling had been sexually assaulted either before or after she died. During cross-examination of Henry Wysham, a detective who supervised the police investigation, appellant questioned him about physical evidence collected at the crime scene and sent to the F.B.I. for analysis. At appellant's request, the F.B.I. reports containing analyses of this evidence were admitted as exhibits. Among the findings in the reports was a conclusion that a uniquely shaped public hair retrieved from combings of Sarah's pubic region "could have originated" from appellant. No testimony about the contents of the reports was introduced at this time.

*on Evidence, supra,* § 4:40 at 464; Annot., 1 A.L.R.3d, *supra,* § 4(b); 40 Am.Jur.2d *Homicide, supra,* § 303.

During its case on rebuttal, the State offered the testimony of the F.B.I. agent who prepared the report on the pubic hair comparison. After qualifying as an expert, the witness explained the process by which the pubic hairs of the appellant and the victim were compared and he repeated the conclusions outlined in the report. Appellant made a timely objection to this testimony, claiming that it was improper rebuttal evidence. The objection was overruled. On appeal, the appellant contends that the admission of the agent's testimony was prejudicial error requiring a new trial. We disagree.

Rebuttal evidence includes any competent evidence which explains, contradicts or replies to any new matter raised by the defense. It is in the trial court's discretion to decide whether particular testimony constitutes proper rebuttal evidence; the court's ruling will not be reversed unless it is shown to be both "manifestly wrong and substantially injurious." *Huffington v. State,* 295 Md. 1, 14, 452 A.2d 1211 (1982), quoting *State v. Hepple,* 279 Md. 265, 270, 368 A.2d 445 (1977). *See also Mayson v. State,* 238 Md. 283, 208 A.2d 599 (1965); *Lane v. State,* 226 Md. 81, 172 A.2d 400 (1961), *cert. denied,* 368 U.S. 993, 82 U.S. 611, 7 L.Ed.2d 529 (1962); *Kaefer v. State,* 143 Md. 151, 122 A. 30 (1923). Assuming *arguendo* that the F.B.I. agent's testimony was not introduced in response to any new matter raised by the defense, we are nevertheless unable to find that the admission of such evidence warrants reversal. Unlike the prejudicial evidence admitted in *Huffington,* this testimony was merely cumulative. *Huffington, supra,* 295 Md. at 16, 452 A.2d 1211. It duplicated evidence already introduced at trial at the request of the appellant; it did not add "an additional, different, and independent fact or circumstance upon which the jury could premise a finding of guilt." *Id.* In fact, it clarified for the jury evidence already introduced at the behest of the defense. The agent merely repeated the report's findings. There was no element of unfair surprise; appellant was familiar with the report's conclusions when he structured his case in defense.

*See* VI *Wigmore on Evidence* § 1873 at 677–78 (Chadbourne rev.1976). Additionally, the impact of the agent's testimony was so insignificant in light of the mass of direct and circumstantial evidence against the appellant that we can "declare a belief beyond a reasonable doubt that the error in no way influenced the verdicts." *Huffington, supra,* 295 Md. at 16, 452 A.2d 1211.

(3)

Appellant contends that the trial court erred in refusing to strike a number of prospective jurors for cause. As a result, he claims that the jury which tried him was unable to render an impartial verdict.

Voir dire was conducted by counsel in chambers over a six-day period. Both sides made numerous motions to strike jurors for cause, many of which were granted. Of the twelve jurors and three alternates impanelled, appellant moved to strike for cause only three. He used only sixteen of the twenty peremptory challenges provided him by Maryland Rule 753 a 1, and he stated that the jury as constituted was acceptable to the defense.

The short answer to appellant's argument is that in the circumstances of this case any objection to the composition of the jury or the panel of talesmen was waived when he unequivocally indicated that the jury was acceptable to him. *White v. State,* 300 Md. 719, 481 A.2d 201 (1984); *Calhoun v. State,* 297 Md. 563, 579–80, 468 A.2d 45 (1983); *Glover, Robinson & Gilmore v. State,* 273 Md. 448, 452–53, 330 A.2d 201 (1975); *Neusbaum v. State,* 156 Md. 149, 162, 143 A. 872 (1928). Furthermore, at the time the jury was impanelled, appellant had four peremptory challenges remaining. He could have removed all three of the jurors who he now contends should have been excluded for cause. Because appellant failed to exhaust all of his peremptory challenges, his claims that the court erred in refusing to strike these jurors for cause are waived. *Bever v. State,* 4 Md.App. 436, 440, 243 A.2d 634 (1968); Annot., 72 A.L.R.2d

905, 908 (1960); 47 Am.Jur.2d *Jury* § 218 (1969); 50 C.J.S. *Juries* § 256 (1947).[2]

(4)

Appellant next claims that the trial court abused its discretion when it called his brother Michael Thomas as a court witness at the State's request during the rebuttal phase of the State's case. The State sought to elicit testimony from Michael concerning incriminating admissions made to him by the appellant the day after the Spurlings were killed. Michael had given a contemporaneous written statement to the police describing this incriminating conversation; however, he subsequently disavowed its truth. He claimed that the police extracted the statement by threatening to incarcerate him until he talked.

Under the rule against impeaching a party's own witness, the State could not vouch for the veracity of Michael's testimony and could not call him as a witness. Over appellant's objection, the court called Michael as its witness and conducted the direct examination, during which Michael denied that some of the incriminating statements attributed to the appellant were ever made. Both the State and the appellant were permitted to cross-examine the witness. During its cross-examination, the prosecution attempted to impeach Michael by reading to the jury the prior written inconsistent statement that he gave to the police. Subsequently, the court on its own motion admitted the written statement without objection from appellant. In its instructions to the jury, the court said:

"[You] will recall on one occasion I did indeed call a witness and ask him some questions on my own. You

---

**2.** A review of the record reveals no indication that appellant was denied a fair trial by an impartial jury. All of the jurors indicated in voir dire that they would lay aside any preconceptions they might have and render a verdict based only on the evidence presented in the case. *See Couser v. State,* 282 Md. 125, 383 A.2d 389 (1978), *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978); *Kujawa v. Baltimore Transit Co.,* 224 Md. 195, 167 A.2d 96 (1961); *Garlitz v. State,* 71 Md. 293, 18 A. 39 (1889).

should not read into my questions any feeling one way or the other regarding the issues in this case, nor are you to try to ascertain from my questions or conduct what I feel the verdict should be in this case."

 Under *Patterson v. State*, 275 Md. 563, 342 A.2d 660 (1975), it lies within the sound discretion of the trial judge whether to call a person to testify as a court witness and that decision will not be reversed absent a clear abuse of discretion. *Id.; Scarborough v. State*, 50 Md.App. 276, 282, 437 A.2d 672 (1981). Clearly, there was no abuse of discretion in this case. Because of the rule preventing impeachment of a party's own witness, the adversary system failed to produce important evidence about a statement made by appellant shortly after the crimes were committed. The court could reasonably have found that this evidence was necessary to prevent a miscarriage of justice. *Patterson, supra*, 275 Md. at 577, 342 A.2d 660. Furthermore, Judge Hormes was "scrupulously careful" to preserve his impartiality in the eyes of the jury; he confined his questioning of Michael strictly to factual matters. *Id.* 275 Md. at 580, 342 A.2d 660. He also instructed the jury to draw no inference from the fact that Michael was called by the court instead of by one of the parties.

Appellant also contends that it was error for the court to allow Michael's written statement to be read to the jury without an instruction that the statement was to be used only for impeachment and not as substantive evidence. Appellant never requested a limiting instruction and we think the point has thus been waived. Maryland Rule 757 h; *Hall v. State*, 292 Md. 683, 441 A.2d 708 (1982). Moreover, both Michael's written statement and his testimony at trial were vague and internally contradictory. At most, the evidence might have been cumulative, and it is unlikely that it affected the jury's verdict in any way.

(5)

 Appellant contends that the court erred when it prevented him from cross-examining the police officer in

charge of the investigation about a statement that Ms. Wilkins might have made to the police.

The State called Detective Wysham to identify photographs of the crime scene as well as certain physical evidence. The witness did not testify on direct examination about any conversations with the rape victim. Indeed, his testimony indicates that he had not questioned her about the incident; she was interviewed by other officers. On cross-examination, the appellant asked whether the victim had told the witness or other officers that she had resisted the attack. The court sustained timely objections by the State. Plainly, this line of questioning was far beyond the scope of the subject matter raised on direct examination and the court's ruling was correct. *See Williams v. Graff*, 194 Md. 516, 522, 71 A.2d 450 (1950).

(6)

Thomas' sixth claim of error concerns that part of the court's instructions to the jury wherein it was stated:

"The return of the indictment by a Grand Jury raises no presumption whatsoever on the part of the Defendant. It is a mere formal charge necessary to place the Defendant upon trial. Any person who is accused of a crime comes into this Court with a presumption of innocence. That presumption remains with him throughout the trial. It is incumbent upon the State to offer you proof to show that the Defendant is guilty of the crime with which he's charged, and the degree of proof that is necessary for the State to offer you is that the Defendant is guilty beyond a reasonable doubt and to a moral certainty.

"Each and every element of the crime charged must be proven by the State beyond a reasonable doubt and to a moral certainty. That does not mean the State must prove a person guilty beyond all doubt and to a mathematical certainty. A reasonable doubt is not a very difficult term to explain, and I will make this explanation of reasonable doubt to you.

"If, after considering all the facts, you can say that you have an abiding conviction of the Defendant's guilt such as you would be willing to act without hesitation upon an important matter relating to your own affairs, then you have no reasonable doubt.

"Stating the same thing a little differently: The evidence is sufficient to remove a reasonable doubt when it convinces the judgment of an ordinarily prudent person of the truth of a proposition with such force that he or she would act upon that conviction without hesitation in his or her own most important affairs. That is the degree of proof that the State must produce in a criminal case in order to justify a verdict of guilty.

"As jurors, you must give due force to the presumption of innocence and proceed cautiously in weighing the evidence, and you are not commanded to be naive and to believe without scrutiny every glib suggestion, whether emanating from the State or from the Defense. An indispensable ingredient in judgment, in Court as well as out of it, is a modicum of common sense.

"*I instruct you that the only burden carried by the accused in a murder trial is a burden of production, and it means simply that some evidence of mitigating circumstances such as hot blood, which I will comment on later, or justification or excuse, such as self-defense, which I will comment on later, must be present either in the State's case or the Defense's case in order to justify a jury determination.*

"Each juror is entitled to decide for himself or herself whether or not any doubt he or she may have is reasonable. If you are not convinced beyond a reasonable doubt of the guilt of the Defendant, then you have a duty to acquit him.

"The Defendant is not required to prove his innocence. The Defendant is entitled to every inference in his favor which can reasonably be drawn from the evidence. Where two inferences may be drawn from the same facts, one consistent with guilt and one consistent with inno-

cence, the Defendant is entitled to the inference which is consistent with innocence." (Emphasis supplied.)

Later, the court instructed the jury that the appellant could not be convicted unless the State proved beyond a reasonable doubt that he had not acted in self-defense.

■ Appellant contends that the italicized instructions unconstitutionally shifted to him the burden of proving that he acted in self-defense in violation of principles enunciated in *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). We note, however, that appellant did not object at trial to the instruction and his objection is therefore waived, absent a finding of "plain error" under Rule 757 h. *See also Tichnell v. State*, 287 Md. 695, 415 A.2d 830 (1980); *State v. Hutchinson*, 287 Md. 198, 411 A.2d 1035 (1980).

■ It is well settled that "when objection is raised to a court's instruction, attention should not be focused on a particular portion lifted out of context, but rather its adequacy is determined by viewing it as a whole." *State v. Foster*, 263 Md. 388, 397, 283 A.2d 411 (1971), *cert. denied*, 406 U.S. 908, 92 S.Ct. 1616, 31 L.Ed.2d 818 (1972). To the same effect, *see Poole v. State*, 295 Md. 167, 186, 453 A.2d 1218 (1983). Viewing the instructions as a whole and in context, we find no error. Of course, an instruction stating that the defendant must prove self-defense would be improper. *Squire v. State*, 280 Md. 132, 368 A.2d 1019 (1977). The instruction in this case, however, does not shift the burden of proof to the defendant; the portion under scrutiny refers only to the "burden of production." Judge Hormes explicitly told the jurors that "the verdict cannot be murder unless you're convinced beyond a reasonable doubt that the Defendant did not act in self-defense." The instruction placing the burden on the defendant to produce some evidence of self-defense in order to generate the issue was a correct statement of the law. *See State v. Evans*, 278 Md. 197, 208, 362 A.2d 629 (1976).

(7)

Appellant next complains that the trial court improperly restricted the scope of his closing argument, during which it sustained objections to two of his statements. We find no reversible error.

 The law of Maryland is clear: the permissible scope of closing argument is a matter for the sound discretion of the trial court, the exercise of which will not constitute reversible error unless clearly abused and prejudicial to the accused. *Wilhelm v. State*, 272 Md. 404, 413, 326 A.2d 707 (1974). Our review of defense counsel's extensive closing remarks reveals no abuse of discretion or prejudice to appellant.

(8)

As a part of its case in chief, the State called Dr. Rudiger Breitenecker to testify about his examination of Noel Wilkins shortly after the assault. In connection with the examination, Ms. Wilkins disclosed certain aspects of her medical history which were recorded in a report of the examination. Before Dr. Breitenecker took the stand, the State made a motion *in limine* to preclude appellant from referring at trial to certain items in the victim's medical history. Specifically, the State sought to prohibit inquiry into (1) whether Ms. Wilkins was a virgin and (2) whether she used a birth control device. In accordance with the Maryland rape shield law, Maryland Code (1982 Repl.Vol.) Art. 27, § 461A,³ the court conducted an in camera review

---

**3.** This section provides:

 "(a) *Evidence relating to victim's chastity.*—Evidence relating to a victim's reputation for chastity and opinion evidence relating to a victim's chastity are not admissible in any prosecution for commission of a rape or sexual offense in the first or second degree. Evidence of specific instances of the victim's prior sexual conduct may be admitted only if the judge finds the evidence is relevant and is material to a fact in issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value, and if the evidence is:

of the evidence. Appellant argued that the medical history was relevant to and probative of his contention that Ms. Wilkins consented to intercourse with him and that she "liked sex with black men." The court ruled that appellant's proffer failed to demonstrate that the evidence was relevant and granted the State's motion. The court indicated that it would change its ruling if evidence was presented subsequently which made the victim's prior sexual activity relevant.

Before us, appellant does not contend that the trial court misapplied § 461A. Nor does he claim that § 461A is unconstitutional on its face. Rather, he argues that the shield law, as applied in this case, violated his sixth amendment right to confront and cross-examine the witnesses against him. In effect, appellant claims that the exclusion of this evidence deprived him of the ability to present an effective defense and that consequently he is entitled to a new trial. We disagree.

Decisions on the relevance of evidence rest in the sound discretion of the trial court and will not be reversed absent a showing that such discretion was clearly abused. *See Durkin v. State*, 284 Md. 445, 453, 397 A.2d 600 (1979); *City of Baltimore v. Zell*, 279 Md. 23, 28, 367 A.2d 14 (1977); *Corbi v. Hendrickson*, 268 Md. 459, 468, 302 A.2d

---

(1) Evidence of the victim's past sexual conduct with the defendant; or

(2) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease, or trauma; or

(3) Evidence which supports a claim that the victim has an ulterior motive in accusing the defendant of the crime; or

(4) Evidence offered for the purpose of impeachment when the prosecutor puts the victim's prior sexual conduct in issue.

(b) *In camera hearing.*—Any evidence described in subsection (a) of this section, may not be referred to in any statements to a jury nor introduced at trial without the court holding a prior in camera hearing to determine the admissibility of the evidence. If new information is discovered during the course of the trial that may make the evidence described in subsection (a) admissible, the court may order an in camera hearing to determine the admissibility of the proposed evidence under subsection (a)."

194 (1973). We find no abuse of discretion here. It is well accepted that evidence of the victim's specific prior sexual acts with persons other than the defendant is not relevant to prove that she consented to intercourse with the defendant. *Johnson, Jr. v. State,* 232 Md. 199, 206, 192 A.2d 506 (1963); *Giles v. State,* 229 Md. 370, 380, 183 A.2d 359 (1962), *appeal dismissed,* 372 U.S. 767, 83 S.Ct. 1102, 10 L.Ed.2d 137 (1963); *Shartzer v. State,* 63 Md. 149, 152 (1885). *See generally* Annot., 94 A.L.R.3d 257 (1979). That is not to say, however, that prior specific sexual acts of the victim may not be relevant for other purposes. *See* Art. 27, § 461A(a)(1)–(4). But the evidence appellant sought to offer clearly was without relevance. Evidence concerning Ms. Wilkins' virginity or use of a birth control device does not tend to prove or disprove that she liked sex with black men and consented to intercourse with the appellant. This evidence was irrelevant and properly excluded.

Since the trial court ruled correctly that the evidence was irrelevant, its exclusion did not violate appellant's constitutional rights. Of course, rape shield laws may not be used to exclude probative evidence in violation of a defendant's constitutional rights of confrontation and due process. *Bell v. Harrison,* 670 F.2d 656 (6th Cir.1982). But a defendant has no constitutional right to present irrelevant evidence at trial. *Doe v. United States,* 666 F.2d 43 (4th Cir.1981); *Pratt v. Parratt,* 615 F.2d 486 (8th Cir.1980), *cert. denied,* 449 U.S. 852, 101 S.Ct. 143, 66 L.Ed.2d 64 (1980); *United States v. Kasto,* 584 F.2d 268 (8th Cir.1978), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979); *Marion v. State,* 267 Ark. 345, 590 S.W.2d 288 (1979); *People v. McKenna,* 196 Colo. 367, 585 P.2d 275 (1978); *People v. Arenda,* 416 Mich. 1, 330 N.W.2d 814 (1982); *State v. Fortney,* 301 N.C. 31, 269 S.E.2d 110 (1980); Annot., 1 A.L.R.4th 283, § 2 at 287 (1980). Where the probative value of the evidence is outweighed by the State's interest in protecting the rape victim from harassment and humiliation at trial, its exclusion does not violate the defendant's right of confrontation, his right to present

an effective defense or his right to due process of law. *See Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *United States v. Kasto, supra; Marion v. State, supra; People v. Arenda, supra; State v. Gardner,* 59 Ohio St.2d 14, 391 N.E.2d 337 (1979). In this case, the evidence was irrelevant, but assuming arguendo that it possessed some relevance, it was far outweighed by the sound public policy supporting § 461A. Furthermore, since this evidence had no bearing on appellant's contention that the victim consented to have intercourse with him, its exclusion caused him no prejudice. We conclude, therefore, that § 461A, as applied to appellant in the circumstances of this case, is not unconstitutional.[4]

(9)

Next, appellant claims that the court improperly admitted evidence tending to prove the good character of the victim, Sarah Spurling. The State called Naomi Ward to testify about Sarah's activities just prior to her death. During direct examination, the witness was asked to describe Sarah "from your relationship with her." Appellant's objection to the inquiry was overruled, after which the witness described Sarah as "a very vivacious person," a dedicated nurse, and a friendly person, liked by all who knew her. Asked whether Sarah ever talked about her child, the witness, over appellant's objection, said, "Yes, she talked about her a lot."

---

**4.** Appellant's reliance on *Schockley v. State,* 585 S.W.2d 645 (Tenn. Crim.1978), is misplaced. In that case, the State tried to prove that the victim became pregnant as a result of the rape. At trial, the defendant was precluded by the Tennessee rape shield law from offering evidence that the victim had sexual relations with other men around the date that the rape allegedly occurred. The court held that it was error to construe the law in this way.

Clearly, *Schockley* is distinguishable. There, the evidence was relevant to disprove the defendant's criminal agency. That this type of evidence may be relevant is recognized by § 461A(a)(2) which permits the introduction of "[e]vidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease, or trauma."

Appellant argues that he is entitled to a new trial because this evidence was irrelevant and prejudicial. We disagree.

It is true that, generally, the character of the homicide victim is irrelevant unless, as we discussed earlier, the defendant raises a claim of self-defense. *See* 1 *Wharton's Criminal Evidence* § 236 at 510 (13th ed. 1972). Appellant did not plead self-defense in the death of Sarah Spurling. Nevertheless, even if the challenged testimony was irrelevant, it was so inconsequential and meaningless as to have had no impact upon the outcome of the case. Of course, "the admission of irrelevant evidence will not require reversal if it appears that the evidence was not prejudicial." *Hopkins v. State,* 193 Md. 489, 499–500, 69 A.2d 456 (1949), *appeal dismissed,* 339 U.S. 940, 70 S.Ct. 797, 94 L.Ed. 1357 (1950). Because we find that appellant was not prejudiced by this evidence, its admission does not necessitate a new trial.

### (10)

Appellant alleges that there was insufficient evidence to support his conviction for the first degree sexual offense of forcing Ms. Wilkins to perform fellatio upon him. He argues that Code, Art. 27, § 554, as interpreted in *Gooch v. State,* 34 Md.App. 331, 367 A.2d 90 (1976), requires proof that the sexual organ penetrated the mouth. The evidence presented at trial indicated that Ms. Wilkins was forced to "kiss" appellant's penis. Since there was no showing that the mouth was penetrated, he argues that the evidence was insufficient to support the first degree sexual offense conviction.

Appellant's contention is meritless. Section 554 pertains to the crime of "unnatural or perverted sexual practices"; he was not charged with violating this law. Rather, appellant was convicted of a first degree sexual offense as set forth in § 464(a) of Art. 27, which provides:

"A person is guilty of a sexual offense in the first degree if the person engages in a sexual act:

(1) With another person by force or threat of force against the will and without the consent of the other person, and:

(i) Employs or displays a dangerous or deadly weapon or an article which the other person reasonably concludes is a dangerous or deadly weapon; or

(ii) Inflicts suffocation, strangulation, disfigurement, or serious physical injury upon the other person or upon anyone else in the course of committing the offense; or

(iii) Threatens or places the victim in fear that the victim or any person known to the victim will be imminently subjected to death, suffocation, stangulation, disfigurement, serious physical injury, or kidnapping; or

(iv) The person commits the offense aided and abetted by one or more other persons."

The term "sexual act," as used in this section, is defined by Art. 27, § 461(e) to include "fellatio"—a word not defined in the statute. We think that the legislature intended to give "fellatio" its common, ordinary and well-accepted meaning. *Black's Law Dictionary* 743 (4th ed. rev. 1968) defines fellatio as an "offense committed with the male sexual organ and the mouth." *See also People v. Sohmers,* 55 Misc.2d 925, 286 N.Y.S.2d 714, 717 (Crim.Ct.1967); *State v. McParlin,* 422 A.2d 742, 743 n. 2 (R.I.1980). *Webster's Third New International Dictionary* gives the following definition: "the practice of obtaining sexual satisfaction by oral stimulation of the penis." Under the general view, proof of penetration is not required; all that must be shown is some contact between the mouth and the male organ. *Carter v. State,* 122 Ga.App. 21, 176 S.E.2d 238 (1970); *State v. Phillips,* 365 So.2d 1304 (La.1978), *cert. denied,* 442 U.S. 919, 99 S.Ct. 2843, 61 L.Ed.2d 287 (1979); *McDonald v. State,* 513 S.W.2d 44 (Tex.Crim.App.1974). Therefore, we hold that fellatio, within the meaning of § 461(e), encompasses the oral contact with the male sex organ involved in this case. Since there was ample evidence to support the jury's verdict on the first degree sexual offense, we con-

clude that appellant is not entitled to a new trial on this issue.

## Sentencing Issues

### (a)

Appellant contends that the trial judge erred in admitting the testimony and report of the State's psychiatric expert, Dr. Michael Spodak, at the sentencing phase of the proceedings. He claims that the admission of this evidence violated his fifth, sixth and fourteenth amendment rights.

The record discloses that Dr. Spodak, a member of the staff of Clifton T. Perkins State Hospital, participated in the pretrial evaluation of the appellant on February 4, 1982, following his plea of insanity and incompetency to stand trial. Earlier, in January of 1982, Dr. Spodak conducted a psychiatric one-on-one examination of appellant at the hospital and filed a full "psychiatric case workup report." At the sentencing hearing before Judge Hormes (a jury determination having been waived), Dr. Spodak testified that prior to his initial examination of appellant, he told him that "any information he revealed would not be held in confidence and might be used in testimony or in written reports"; and that "the State was seeking the death penalty and [I] advised him that anything that he discussed with me were he to be found guilty might be used in subsequent testimony at a sentencing proceeding." Asked whether appellant understood that explanation, Spodak testified that appellant "said he did understand that they were seeking the death penalty and that anything he told me would not be held in confidence." Spodak further testified that following this explanation, appellant willingly proceeded with the interview.[5]

---

5. Spodak's written report, received in evidence, also reflected that he told appellant that the State was seeking the death penalty; "that any information he disclosed might be testified to at a sentencing phase of his trial depending on the outcome"; and that prior to the psychiatric evaluation, "the defendant indicated that he clearly understood that any information he disclosed might be used for that purpose."

After appellant had been found guilty at trial, the State petitioned the court for permission to conduct a "Presentence psychiatric evaluation" of the appellant. The State's petition referred to the earlier psychiatric evaluation of the appellant at the Perkins Hospital which found that appellant was criminally responsible and competent to stand trial. The petition also stated that it was desirable to supplement the appellant's original insanity evaluation with further interviews "to develop material for presentation at sentencing"; that Dr. Spodak, who participated in the insanity evaluation, could conduct the further psychiatric examination; and that appellant's counsel had no objection to the evaluation. The court approved the State's petition and Dr. Spodak thereafter interviewed appellant on November 27, 1982 at the jail, telling him at that time that he had been "retained by the State's Attorney's Office ... to evaluate him on certain issues about the death penalty, and that depending on what he said and depending on my findings, I might very well be called as a witness to testify at the sentencing phase." Dr. Spodak testified that appellant indicated that he understood the explanation and was willing to be interviewed at that time.

At the sentencing hearing, the State sought to introduce Dr. Spodak's report and testimony concerning his post-trial psychiatric examination of the appellant. Appellant's counsel objected on the ground that he was under the impression that "Dr. Spodak would see [the appellant] as a member of the staff of Clifton T. Perkins" while, in actuality, he conducted the examination as "a paid doctor by the State's Attorney's Office"; that had he known of this fact, he would not have permitted the examination and would have advised the appellant "not to discuss any matters with Dr. Spodak so long as he was then in the employ of the State's Attorney's Office ... [because] the Doctor is no longer a pure objectionist, but is a paid person whose views obviously more than likely reflect the views sought by his employer." The court overruled the objection, stating that Dr. Spodak was a qualified forensic psychiatrist and "it makes

no difference who pays him ... [since] nobody and no amount of money is going to cause him to change his opinion." Thereafter, Dr. Spodak's report and testimony were received in evidence; they negated the existence of two possible mitigating circumstances under Art. 27, § 413(g)(4) and (7), *i.e.*, that the murders of Donald and Sarah Spurling were not committed "while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder, emotional disturbance or intoxication"; and that it was not "unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society." [6]

Appellant acknowledges that under *Johnson v. State,* 292 Md. 405, 439 A.2d 542 (1982), Perkins' psychiatrists are deemed to be wholly impartial experts and not partisans of the prosecution, even though paid by the State. The "crucial point," according to appellant, is that nowhere in the State's petition was it suggested that Spodak would be functioning as other than a Perkins' psychiatrist; and he relies for reversal upon *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

In *Estelle,* the issue was "whether the prosecution's use of psychiatric testimony at the sentencing phase of respondent's capital murder trial to establish his future dangerousness violated his constitutional rights." 451 U.S. at 456, 101 S.Ct. at 1869. There, the trial judge, prior to trial, sua sponte and without notifying the defendant's counsel, ordered that the defendant be examined by a psychiatrist to determine his competency to stand trial. The psychiatrist filed a report with the court indicating that the defendant was competent. Subsequently, the defendant was convicted. At the sentencing phase of the capital proceeding, the State was required to prove as a condition precedent to

---

**6.** A copy of Dr. Spodak's report was given to appellant prior to the sentencing hearing.

imposition of the death penalty that there was a probability beyond a reasonable doubt that the defendant would be dangerous in the future. The State called the psychiatrist as its witness. Based solely on his pretrial psychiatric examination of the defendant, the psychiatrist testified affirmatively as to the defendant's future dangerousness.

The Supreme Court first addressed the issue whether, in the circumstances, the psychiatrist's testimony violated the defendant's fifth amendment privilege against compelled self-incrimination because the defendant was not advised before the pretrial psychiatric examination that he had a right to remain silent and that any statement he made could be used against him at the capital sentencing proceeding. The Court concluded that the ultimate penalty of death was a potential consequence of what the defendant told the psychiatrist; that any effort by the State to compel the defendant to testify against his will at the sentencing hearing would contravene the fifth amendment; and thus the State's effort to establish the defendant's future dangerousness by relying on "the unwarned statements" made to the psychiatrist infringed the fifth amendment. *Id.* at 462–63, 101 S.Ct. at 1872–73. In this connection, the Court pointed out that the psychiatrist's diagnosis as to future dangerousness was not based solely on his observation of the defendant but rather upon statements made, and not made, by the defendant in his recital of the details of the crime. The Court emphasized that simply because the defendant's statements "were uttered in the context of a psychiatric examination does not automatically remove them from the reach of the Fifth Amendment." *Id.* at 465, 101 S.Ct. at 1874. The results of the examination, the Court said, were used by the State for purposes far beyond merely establishing the defendant's competency to stand trial;[7] they were used instead to establish the "critical

7. The Court indicated, 451 U.S. at 465, 101 S.Ct. at 1874, that the fifth amendment would not have been implicated had the psychiatrist's

issue" of respondent's future dangerousness, proof of which beyond a reasonable doubt was prerequisite to imposition of the death penalty. Thus, the Court said that because the State satisfied its burden of proof by using the defendant's "own statements, unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty," the fifth amendment privilege applied in such "distinct circumstances." *Id.* at 466, 101 S.Ct. at 1875. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) was cited as authority, the Court stating that "[t]he considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination at issue here." *Estelle, supra,* 451 U.S. at 467, 101 S.Ct. at 1875. The Court continued:

> "That respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, is immaterial. When [the psychiatrist] went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Id.*

Further on in its opinion, the Court said:

> "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Because respondent did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on

---

findings been used only to determine defendant's competency to stand trial or whether he was criminally responsible.

what he said to [the psychiatrist] to establish his future dangerousness." *Id.* at 468, 101 S.Ct. at 1876.

The Court concluded that the defendant's statements to the psychiatrist "could be used as the State did at the penalty phase only if respondent had been apprised of his rights and had knowingly decided to waive them." [8] *Id.* at 469, 101 S.Ct. at 1876.

As to the sixth amendment right to counsel, the Court said that the issue was whether the right was abridged when the defendant was not given a prior opportunity to consult with counsel about his participation in the pretrial psychiatric examination. The Court held that as counsel was not notified that the psychiatric examination would encompass the issue of future dangerousness, and because the defendant was denied the assistance of counsel in making the significant decision of whether to submit to the examination, and to what end the psychiatrist's findings could be used, the sixth amendment right to counsel was violated. *Id.* at 471, 101 S.Ct. at 1877. In n. 16, *id.* at 471, 101 S.Ct. at 1877, the Court indicated that a waiver of the constitutional right to the assistance of counsel could be found where there was a voluntary, knowing and intelligent relinquishment or abandonment of the known sixth amendment right.

We think it clear that appellant's objection to Dr. Spodak's testimony and report was not based on constitutional principles enunicated in *Estelle* but rather was predicated solely on a non-constitutional basis, *i.e.*, that in conducting the post-trial evaluation, Dr. Spodak was not a neutral expert, as appellant's counsel thought when he consented to the interview, but was paid by the prosecution; and because the psychiatrist was biased against the appel-

---

**8.** In n. 13, 451 U.S. at 469, 101 S.Ct. at 1876, the Court remarked: "Of course, we do not hold that the same Fifth Amendment concerns are necessarily presented by all types of interviews and examinations that might be ordered or relied upon to inform a sentencing determination."

lant, the evidence was inadmissible. It is, of course, well settled that "where specific grounds are delineated for an objection, the one objecting will be held to those grounds and will ordinarily be deemed to have waived grounds not specified." *Jackson v. State*, 288 Md. 191, 196, 416 A.2d 278 (1980). *See also Mays v. State*, 283 Md. 548, 554, 391 A.2d 429 (1978); *State v. Kidd*, 281 Md. 32, 39, 375 A.2d 1105 (1977); *von Lusch v. State*, 279 Md. 255, 263, 368 A.2d 468 (1977). We think appellant's objection was one going to the weight, rather than the admissibility of Dr. Spodak's testimony and report; accordingly, we find no error in the admission of this evidence.

█ Assuming *arguendo* that the objection was constitutionally grounded in the principles of *Estelle*, we nevertheless find no error in the circumstances of this case. Maryland's capital penalty statute, unlike the Texas statute involved in *Estelle*, takes account of the defendant's future dangerousness only by way of a mitigating circumstance—whether it is unlikely that the defendant will be dangerous in the future. The State does not bear the burden of proving the nonexistence of mitigating circumstances, *Tichnell v. State*, 287 Md. 695, 415 A.2d 830; thus, the appellant's words were not used against him on a matter upon which, as in *Estelle*, the prosecution held the burden of proof. Moreover, during appellant's original psychiatric evaluation by Dr. Spodak, he was told that any information which he revealed to the psychiatrist would not be held in confidence but could be used at a subsequent capital sentencing hearing. Unlike counsel in *Estelle*, appellant's lawyer had prior notice of both examinations by Dr. Spodak and had the opportunity to confer with appellant before each examination. The *Miranda*-type warnings given to appellant prior to his initial examination were wholly absent in *Estelle*—another distinguishing feature between that and the present case. Equally clear is the fact that appellant's counsel was advised prior to agreeing to the evaluation that the post-trial examination by Dr. Spodak was intended to develop material for presentation at the sentencing hearing.

In the circumstances, even if appellant's counsel was honestly mistaken in the belief that Dr. Spodak would evaluate the appellant in his capacity as a Perkins' psychiatrist, that fact alone would not require reversal under the principles of *Estelle.* We thus conclude, on the record in this case, that appellant's fifth, sixth and fourteenth amendment rights were not violated by the admission into evidence of Dr. Spodak's report and testimony.

### (b)

The State called two witnesses to testify at the sentencing hearing about appellant's prior unrelated criminal activity. Because appellant was not prosecuted on either occasion, this testimony related to crimes for which there were neither convictions nor pleas of guilty or nolo contendere. Thus, appellant argues that this evidence was inadmissible under Article 27, § 413(c)(1)(iii),[9] as interpreted in *Scott v. State,* 297 Md. 235, 465 A.2d 1126 (1983).

Baltimore City Police Officer Bruce Tyler testified about a shooting in July of 1981. He said that appellant had become involved in a disturbance at a liquor store, as a result of which he was ejected from the store by the owner; that appellant thereafter threatened the owner who pulled out a pistol and fired a warning shot; and that because the warning shot did not deter the appellant, the owner fired another shot which struck the appellant in the chest. Appellant was not charged with any crime. He objected to the witness' testimony on the ground that it was hearsay. The objection was overruled.

---

**9.** The section provides:
 "(c) *Evidence; argument; instructions.*—(1) The following type of evidence is admissible in this proceeding:
 (i) ...
 (ii) ...
 (iii) Evidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures."

As we have already observed, our cases make plain that where specific grounds for an objection are given, the party objecting is held to those grounds and all others not specified are waived. Here, appellant based his objection on the claim that the witness' testimony was hearsay. Any objection to the evidence as inadmissible under § 413(c)(1)(iii) was waived. Thus, this issue was not properly preserved on appeal. *See Calhoun v. State*, 297 Md. 563, 601, 468 A.2d 45 (1983).

Several minutes later, after most of the details about the liquor store incident had been disclosed, appellant stated to the court that it was necessary "to try this case," referring again to the same incident. The court responded by stating that it had no intention of doing so, but rather would only rule on the appellant's objections. As already indicated, the objection failed to specify § 413(c)(1)(iii) as the grounds for excluding this evidence. We said in *Calhoun, supra*, 297 Md. at 601, 468 A.2d 45:

> "In the absence of an objection focusing on the point before the Court in *Scott*, the evidence here was admissible under Art. 27, § 413(c)(1)(v), which permits introduction of, 'Any other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements.'"

Later, the State called Carol Alston and proffered that she would testify that in March of 1980 appellant attempted to steal her purse. Appellant's counsel objected "to the whole line of questioning ... that this witness is called go give." The court overruled the objection, stating that it had "to get into one item at a time." Appellant later indicated in a colloquy with the court that the basis for the objection was relevance. The court said: "I don't think this testimony has any probative value at all other than at most minimally a little bit of cumulative stuff as to Mr. Thomas' background." The court supplemented its statement, saying "I just don't want to get into something that's really hesitant," to which the appellant responded: "That's why I objected

initially." Thus, appellant did not contend that the evidence was inadmissible under § 413(c)(1)(iii). An objection based on § 413(c)(1)(v) to the relevance of testimony does not constitute an objection under § 413(c)(1)(iii). *Scott, supra,* 297 Md. at 245, 465 A.2d 1126; *Johnson, supra,* 292 Md. at 441, 439 A.2d 542. Thus, the issue is not preserved for appellate review. In the absence of an objection focusing on the exclusion of evidence by § 413(c)(1)(iii), evidence of unrelated prior activities that did not result in a conviction, guilty plea or plea of nolo contendere are admissible under § 413(c)(1)(v). *Calhoun,* 297 Md. at 601, 468 A.2d 45.

(c)

■■■ Appellant was twenty-three years of age when the murders were committed. He contends that his youthfulness should have been found to constitute a mitigating circumstance at the sentencing hearing, and that the trial court's failure to so find was error.

Section 413(g)(5) of Article 27 directs the sentencing authority to determine, by a preponderance of the evidence, whether "[t]he youthful age of the defendant at the time of the crime" was a mitigating circumstance. *Stebbing v. State,* 299 Md. 331, 361, 473 A.2d 903 (1984); *Tichnell v. State,* 287 Md. 695, 730, 415 A.2d 830 (1980). We first discussed the appropriate standard for reviewing this question in *Stebbing.* We there applied an analysis analogous to that used in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), for reviewing the legal sufficiency of the evidence to support a conviction. *Stebbing, supra,* 299 Md. at 361, 473 A.2d 903. We said:

"[T]he standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational sentencing authority could have concluded that the accused failed to prove the claimed mitigating circumstance by a preponderance of the evidence." *Id.* (emphasis in original).

Like appellant in the instant case, Stebbing claimed that the sentencing court erred when it failed to find youthful

age as a mitigating circumstance. She was nineteen years old at the time the crime was committed. We observed that

"the mitigating circumstance of youthful age is not measured solely by chronological age. Had the General Assembly meant to establish an age at or below which the death penalty could not be imposed, it could have so specified." [10]

In addition to her chronological age, Stebbing's extensive prior criminal record, her below average IQ, and her marriage seven months before were considered. We ruled that there was no error in failing to find that youthfulness was proved as a mitigating circumstance. 299 Md. at 369, 473 A.2d 903.

In the instant case, appellant introduced evidence that he had a below normal IQ and had suffered a serious head injury during his early teens; that he was the product of a broken home and had been a victim of child abuse; that his mother was a chronic alcoholic who died when appellant was a teenager; and tht his father deserted the family early on. It was also shown that appellant fathered two children and has a history of drug and alcohol abuse. Prior to the murders, appellant had been convicted in 1976 for robbery.

In passing sentence upon appellant, the court considered all of these factors. It found that his family background was a mitigating circumstance under § 413(g)(8).[11] The court also accepted appellant's claim, made during closing argument, that he had a "mental age" of fourteen or fifteen, though no such evidence was presented. Upon weighing all of the evidence presented to it, the court found

---

**10.** We noted in *Stebbing* that the legislature had rejected one amendment to §§ 412–14 prohibiting imposition of the death penalty on those under 18 and another precluding its application to individuals 25 years old or younger. *Stebbing, supra,* 299 Md. at 367 n. 9, 473 A.2d 903. *See* 1 *Maryland Senate Journal* 984–85 (1978).

**11.** That provision requires the sentencing authority to consider

"[a]ny other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case."

that youthfulness as a mitigating factor did not exist. We find no error in the court's ruling. See *Trimble v. State,* 300 Md. 387, 478 A.2d 1143 (1984).

Appellant contends that *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), demands a different result. We disagree. The defendant in that case, a sixteen-year-old, was convicted of killing a state highway patrol officer. He presented a substantial amount of evidence about his violent background but the court refused to consider it. The Supreme Court said:

> "[I]t is clear that the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact; rather he found that as a *matter of law* he was unable even to consider the evidence."

455 U.S. at 113, 102 S.Ct. at 876 (emphasis in original). The Court held that the sentencer may not refuse to consider, as a matter of law, any mitigating evidence. *Id.* at 113–14, 102 S.Ct. at 876. In contrast, Judge Hormes in the present case carefully considered all of appellant's evidence on the issue of youthfulness as a mitigating circumstance; he found that this factor was not proved by a preponderance of the evidence. Thus, the court's conclusion is in no way inconsistent with *Eddings.*

### (d)

■ Appellant next contends that the trial court misapplied the provisions of § 413. The record reveals that, with respect to both murders, the court followed statutorily mandated procedures. In establishing the appropriate sentence for each murder, the court found beyond a reasonable doubt the aggravating factor, as authorized by § 413(d)(9), that the appellant "committed more than one offense of murder in the first degree arising out of the same incident." With respect to Donald's murder, the court did not find the presence of any of the statutorily enumerated mitigating factors. It did find that "motive to kill," demographic characteristics and background of the defendant were mitigating circumstances in Donald's killing under § 413(g)(8)

and that they outweighed the aggravating circumstance; a life sentence was imposed. Regarding Sarah's murder, the court again found that none of the statutorily enumerated mitigating factors had been proved by a preponderance of the evidence. It found that appellant's family background and demographic characteristics constituted mitigating factors under § 413(g)(8) but concluded that they did not outweigh the statutory aggravating factor. Accordingly, the court concluded that, under § 413(h)(2), the proper sentence was death. The court's findings were made in writing and signed. We find no error in the trial court's application of § 413.

### (e)
### Proportionality Review

As required by Article 27, § 414(e)(4), we next consider the question "whether the sentence of death [imposed upon appellant for Sarah's murder] is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

The principles governing proportionality review of a death sentence in Maryland have been stated in a number of our cases. *Stebbing v. State,* 299 Md. 331, 473 A.2d 903 (1984); *Colvin v. State,* 299 Md. 88, 472 A.2d 953 (1984); *Calhoun v. State,* 297 Md. 563, 468 A.2d 45 (1983); *Tichnell v. State,* 297 Md. 432, 468 A.2d 1 (1983). The fundamental object of the statutorily mandated appellate review process is the avoidance of the arbitrary or capricious imposition of the death penalty by affording similar treatment to similar capital cases. *Tichnell,* 297 Md. at 466, 468 A.2d 1. The focus of § 414(e)(4) is upon capital cases in which the sentencing authority determined to impose a life or death sentence; the subsection aims to assure that upon consideration of both the crime and the defendant the aggravating and mitigating circumstances present in one capital case will lead to a result similar to that reached under similar circumstances in another capital case, thus identifying the

aberrant sentence and avoiding its ultimate imposition. *Id.* 297 Md. at 465, 468 A.2d 1. Our procedure is to review all reports filed by trial judges in capital sentencing cases, as required by Maryland Rule 772A, and to select those which we deem "similar" within the contemplation of the statute.

The appellant's case is the only one within the relevant inventory of capital cases in which the sentencing authority found, as the *sole* aggravating circumstance, that the defendant had "committed more than one offense of murder in the first degree arising out of the same incident." § 413(d)(9). Judge Hormes, as the sentencing authority, was unable to conclude that the other aggravating circumstances relied upon by the State—robbery or attempt to rob Donald Spurling and the commission or attempted commission of rape or sexual offense in the first degree upon Sarah (§ 413(d)(10))—had been established beyond a reasonable doubt, even though the jury had convicted the appellant both of premeditated and felony murder, the latter based upon findings that these aggravating factors had been proved. In imposing a life sentence for Donald's murder, Judge Hormes found the existence of several non-statutorily enumerated mitigating factors under the "catch-all" provisions of § 413(g)(8), *i.e.,* "demographic characteristics and background of defendant" and "motive to kill." In this latter finding, Judge Hormes, in his sentencing remarks, stated that the victim had invited the appellant to his home on the night of the crime and that the evidence that the appellant robbed or attempted to rob Donald was not convincing beyond a reasonable doubt. In imposing a death sentence for Sarah's murder, Judge Hormes again found the existence of "demographic characteristics and background of defendant" as mitigating circumstances. In his sentencing remarks, Judge Hormes said that Sarah had been sexually molested by the appellant, but he could not find, beyond a reasonable doubt, that she had been raped or was the victim of a sexual offense in the first degree while she was alive. However, he found, as to Sarah's murder,

that the mitigating circumstances did not outweigh the aggravating circumstances.

The appellant contends that the death sentence imposed upon him for Sarah's murder was excessive and disproportionate to the penalty imposed in a number of other more repugnant cases where only life sentences were imposed. He also contends that his death sentence was disproportionate because the two murders were not substantially different and thus it was inequitable to sentence him to death for one murder and life for the other.

The appellant was twenty-three years old at the time of the crime. Earlier, he had been convicted of robbery. The crime scene was one of great violence, as demonstrated by the numerous pictorial exhibits in the case. Donald Spurling had been stabbed twenty-two times; one stab wound penetrated six or seven inches through his heart. Sarah Spurling had been stabbed fifteen times over various parts of her body. She was nude from the waist down except for her panties, the crotch of which had been cut or torn away. She had been sexually molested, as had Noel Wilkins, the boarder, who had been raped at knife point during the same criminal episode that resulted in the deaths of Donald and Sarah. Both the jury and the sentencing authority rejected appellant's claim of self-defense in the killing of Donald. Manifestly, they gave no credence to appellant's testimony that he did not remember killing Sarah. Indeed, the physical evidence at the crime scene attested to a savage and violent attack upon Sarah by one intent upon murdering her—hardly the frenzied attempt to escape from Sarah suggested by appellant in argument before us.

We have carefully reviewed the relevant inventory of capital sentencing cases and have selected a number which we deem similar to that of the appellant, bearing in mind, of course, that simply because dissimilarities exist between cases does not mean that the Court is powerless to complete the comparative review process contemplated by § 414(e)(4). Manifestly, to so conclude would inappropriate-

ly ascribe to the legislature an intention not to enact an effective or operative death penalty statute. *See Tichnell, supra,* 297 Md. at 471, 468 A.2d 1.

*John Huffington.* The defendant, almost nineteen years old at the time of the crimes, and a dealer and user of drugs, together with an accomplice, abducted the victim from his mobile home and shot him five times in the back and head, thereafter stealing drugs from his person. Huffington immediately returned to the victim's home where he murdered another individual while she was asleep, by striking her with a bottle and stabbing her thirty-three times. The defendant then took money and drugs from the home and fled. Two statutory aggravating circumstances were charged and established, *i.e.,* that the defendant committed more than one first degree murder arising out of the same incident and that he committed both murders in the course of a robbery. The mitigating circumstances were that the defendant was of youthful age and had not been previously found guilty of a crime of violence. A death sentence was imposed.[12] While the sentence has not as yet been reviewed by this Court, it is presumptively correct. *See Stebbing v. State, supra,* 299 Md. at 376, 473 A.2d 903.

*Robert Brantner.* The defendant, age forty-one at the time of the offenses, set fire to a home resulting in the death of three individuals. Two statutory aggravating circumstances were found to exist, *i.e.,* that the defendant committed more than one first degree murder arising out of the same incident and that the murders were committed in the course of an arson. The mitigating circumstances found were that the defendant had no prior record and committed the crimes while his mental capacity was substantially impaired. Life sentences were imposed.

---

12. At an earlier trial for the same offenses, Huffington was found guilty and sentenced to death where the same aggravating and mitigating circumstances were established. Finding evidentiary error at the trial, we reversed these convictions. *See Huffington v. State,* 295 Md. 1, 452 A.2d 1211 (1982).

*Willie Green.* The defendant, age forty at the time of the crimes, together with an accomplice, murdered two employees of a restaurant in the course of a robbery. The victims were both stabbed to death; one victim had his hands tied behind him and his throat was slit. Two aggravating circumstances were found to exist, namely, that Green committed more than one murder in the first degree arising out of the same incident and that the murders were committed during the commission of a robbery. The mitigating circumstances were that the defendant was not the sole proximate cause of the deaths of the victims and that it was unlikely, in view of his age, that he would engage in further criminal activity. The trial court, as sentencing authority, found by a preponderance of the evidence that the mitigating factors outweighed the aggravating factors. Life sentences were imposed.

*Vernon Evans, Jr.* The defendant, thirty-three years old at the time of the crime, was employed by Anthony Grandison to murder two witnesses scheduled to appear against Grandison in a federal criminal trial. Utilizing an automatic pistol equipped with a silencer, the defendant entered the lobby of a motel where he was told the witnesses worked. The defendant there shot to death two persons whom he believed to be the targeted witnesses. Two statutory aggravating circumstances were charged and established, *i.e.,* that the defendant committed the murders pursuant to an agreement or contract for remuneration or the promise of remuneration to commit the murders; and that the defendant committed more than one first degree murder arising out of the same incident. The sole mitigating circumstance found to exist was "drug addiction." A death sentence was imposed by the jury for each murder. While neither sentence has as yet been reviewed by us, the sentences are presumptively correct under *Stebbing v. State, supra,* 299 Md. at 376, 473 A.2d 903.

*Howard Hines.* The defendant, age twenty-five at the time of the crime, accosted a twenty-two year old college student while she was walking, stabbed the victim forty to

fifty times, sexually assaulted and ultimately strangled her to death. The statutory aggravating circumstance was that the murder was committed in the commission of or attempt to commit rape; the mitigating circumstance was that Hines committed the offense while he was substantially impaired due to mental incapacity. The trial judge's report indicated that Hines had a "thought disorder, bearing schizophrenic-like characteristics." A life sentence was imposed.

*Theodore Wiener.* The defendant, nineteen and one-half years old at the time of the crime, raped a twenty-two year old victim, after which he stabbed her 101 times, nearly decapitating her and causing her death. First degree rape was the only aggravating factor. Mitigating factors found to exist were a lack of a prior record of a crime of violence, substantially impaired mental capacity, and youthful age. A life sentence was imposed upon a finding that the mitigating factors outweighed the aggravating circumstance.

Additionally, the cases of Elvis Horton and John Kevin Johnson, especially relied upon by appellant, bear brief review. Horton, age thirty-six at the time of the offense, raped, bludgeoned and strangled to death a twelve year old victim. Johnson, age twenty-six when the offense was committed, kidnapped, raped and sodomized a thirteen year old victim, and thereafter shot her to death and threw her body over a bridge. In each of these cases the sentencing jury deadlocked, thus preventing any findings on matters of aggravation and mitigation and suggesting that one or more jurors determined to show mercy. As we observed in *Stebbing v. State,* 299 Md. at 380, 473 A.2d 903, the individualized decision in those cases to show mercy does not mean that the sentence under review is excessive or disproportionate.

Considering the crimes committed by the appellant in this case, as well as the appellant himself, in light of the aforegoing "similar" cases, we cannot conclude that the death sentence imposed upon him was excessive or disproportionate. In so concluding, we are in no way convinced

that the life sentence imposed upon the appellant for Donald's murder commands that the same sentence be imposed for Sarah's murder under § 414(e)(4).

(f)

*Other Contentions*

Appellant argues that Maryland's capital punishment statute is facially unconstitutional for the following reasons:

(a) Article 27, § 413(d)(10) creates an unconstitutional aggravating factor because felony murder is not one of the "small number of extreme cases" in which the death sentence is appropriate, *Gregg v. Georgia*, 428 U.S. 153, 182, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976);

(b) section 413(c) gives the sentencing authority virtually unbounded discretion;

(c) section 413 unconstitutionally restricts the discretion of the sentencing authority by requiring imposition of the death sentence if no mitigating circumstances are shown;

(d) the statute unconstitutionally places the burden of proving the existence of mitigating circumstances on the defendant;

(e) imposition of the death penalty violates Articles 16 and 25 of the Maryland Declaration of Rights; and

(f) the proportionality review provided for by § 414(e)(4) is inadequate.

We rejected each of these arguments in *Calhoun v. State*, 297 Md. 563, 606–38, 468 A.2d 45 (1983). Thus, we consider these matters settled.

JUDGMENTS AFFIRMED, WITH COSTS.

ELDRIDGE, Judge, concurring in part and dissenting in part:

Affirmance of the death sentence in this case cannot be squared with the Supreme Court's decision in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

*Estelle* held, *inter alia,* that the admission of psychiatric testimony offered by the prosecution at a capital sentencing proceeding, based on a psychiatric examination of the defendant performed without the consent or advice of the defendant's attorney, violated the Sixth Amendment right to the assistance of counsel. With respect to the Sixth Amendment issue, the only difference between *Estelle* and the present case is that in *Estelle* there was no consent or guidance by defense counsel concerning the psychiatric examination, whereas here the "consent" of the defendant's attorney was obtained through deception. Such difference has no legal effect.

Although I agree that the guilty verdicts in this case should be upheld, I would vacate the death sentence and remand the case for a new sentencing proceeding.

## I.

In order to appreciate fully the position of defense counsel in this case, and how he was misled into "consenting" to an examination by the prosecution's hired psychiatrist for purposes of the capital sentencing hearing, it is appropriate to begin with this Court's opinion in *Johnson v. State,* 292 Md. 405, 410–416, 439 A.2d 542 (1982).

In *Johnson* the indigent defendant was charged with murder and the death penalty was sought. Johnson interposed a defense of insanity, and the trial court ordered that he be transferred to the Clifton T. Perkins Hospital Center for mental examination and evaluation. The Clifton T. Perkins Hospital Center is a state facility, "maintained under the direction" of the Mental Hygiene Administration of the Department of Health and Mental Hygiene.[1] Johnson was examined by the staff at Clifton T. Perkins, and thereafter the hospital filed a report finding that, at the time of the alleged offense, Johnson "was not suffering from a mental disorder which caused him to lack substantial

---

1. Maryland Code (1982), § 10–406(a) of the Health-General Article.

capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." 292 Md. at 410, 439 A.2d 542. The report indicated that it represented the views only of a majority of the examining psychiatrists. One of the examining staff members had declined to join the report.

Johnson's attorney then petitioned the trial court "to appoint a private 'independent psychiatrist' to further examine Johnson at the expense of the State," but the trial court refused, holding that the staff doctors at Clifton T. Perkins were " 'independent.' " 292 Md. at 411, 439 A.2d 542. On appeal, this Court agreed with the trial court regarding the issue. Drawing a sharp distinction between doctors employed by the Department of Health and Mental Hygiene and expert witnesses hired by the prosecution, Judge Digges stated for the Court (*id.* 292 Md. at 414, emphasis added, 439 A.2d 542):

"The doctors designated by the Department of Health and Mental Hygiene to examine Johnson *are thus 'not partisans of the prosecution,* though their fee is paid by the State, any more than is assigned counsel for the defense beholden to the prosecution merely because he is ... compensated by the State. Each is given a purely professional job to do—counsel to represent the defendant to the best of his ability, the designated psychiatrists impartially to examine into and report upon the mental condition of the accused.' *McGarty v. O'Brien,* 188 F.2d 151, 155 (1st Cir.1951), *cert. denied,* 341 U.S. 928 [71 S.Ct. 794, 95 L.Ed. 1359] (1951)."

The Court went on to point out that "Johnson was evaluated by a team of *independent* psychiatric experts" and that he could call as his witnesses "members of the examining team." *Id.* 292 Md. at 415, 439 A.2d 542, emphasis added.[2]

---

2. The *Johnson* court's view of Clifton T. Perkins Hospital Center is underscored by a recent murder trial in Baltimore County, in which the prosecution was seeking the death penalty and the defendant had raised the defense of insanity. In that case, State v. Mooring, the five

Turning now to the facts in the case at bar, after the defendant Thomas filed an insanity plea the trial court, on December 8, 1981, signed an order that Thomas be examined "by the Department of Health and Mental Hygiene." Thomas was then transferred to the Clifton T. Perkins Hospital Center where he was examined and evaluated by the staff. On February 4, 1982, the hospital sent a report to the court which contained the evaluations of four staff doctors, one of whom was Dr. Michael Spodak. According to the report, all four doctors were of the opinion that Thomas was competent to stand trial and had been responsible for his actions at the time of the offenses.

Following the trial on the issues of guilt or innocence, the prosecuting attorney filed the following petition with the court:

## "PETITION FOR PRE–SENTENCE PSYCHIATRIC EVALUATION

"Now comes the State of Maryland, by Sandra A. O'Connor, State's Attorney for Baltimore County, and by Thomas S. Basham and Alfred L. Brennan, Jr., Assistant State's Attorneys for Baltimore County, and says:

"1. That the Defendant was evaluated at the Clifton T. Perkins Hospital Center following his entry of a plea of not guilty by reason of insanity;

"2. That the findings of the Hospital Center are contained in a report to the Court dated February 4, 1982;

"3. That it is desirable to supplement the original insanity evaluation with further interview(s) of the De-

---

Clifton T. Perkins staff psychiatrists who examined Mooring unanimously believed that he was insane at the time of the offense, and they testified as defense witnesses at the trial. At the conclusion of the trial, the court found Mooring not guilty, agreeing with the position of the Clifton T. Perkins doctors that Mooring's mental condition rendered him not criminally responsible for the victim's death. *See The Sun* (Baltimore), October 9, 1984, section D, p. 1; *The Evening Sun* (Baltimore), October 9, 1984, section D, p. 1; *The Sun* (Baltimore), October 10, 1984, section F, p. 1.

fendant to develop material for presentation at sentencing;

"4. That Dr. Michael Spodak, who participated in the insanity evaluation, can conduct such further interview with the Defendant at the Baltimore County Detention Center and can do so within a few days of a court order authorizing such evaluation;

"5. That counsel for the Defendant has no objection to such an evaluation.

"WHEREFORE, the State prays that this Honorable Court pass an order directing Dr. Michael Spodak to conduct a further evaluation of the Defendant at the Baltimore County Detention Center for the purpose of developing material for use at sentencing.

"/s/ Sandra A. O'Connor
SANDRA A. O'CONNOR
State's Attorney for
Baltimore County"

The prosecuting attorney said nothing to defense counsel or in the petition intimating that the examination and evaluation by Dr. Spodak would not be done in his capacity as a staff member of Clifton T. Perkins Hospital Center and an employee of the Department of Health and Mental Hygiene. On the contrary, the petition seemed to suggest that Dr. Spodak would be examining and evaluating Thomas as a member of the hospital's staff, as it referred to the prior evaluation "at the Clifton T. Perkins Hospital Center," referred to the Hospital Center's findings in the February 1982 report, referred to Dr. Spodak as one who participated in the previous Clifton T. Perkins evaluation, and stated that it is desirable to "supplement" the original evaluation.

Unknown to the court and to defense counsel when he consented to the supplemental examination and evaluation, was the fact that Dr. Spodak had changed hats. He would not be examining and evaluating Thomas as the "independent" psychiatrist employed by the Department of Health and Mental Hygiene. Instead, he would be acting as the prosecution's hired expert witness, paid by the prosecuting

attorney's office to assist that office in obtaining the execution of Mr. Thomas.

During the sentencing hearing, after the prosecution called Dr. Spodak to the stand and the doctor acknowledged that at the time of the examination and evaluation for the sentencing hearing "I was retained by the State's Attorney's Office," the prosecution sought to introduce Dr. Spodak's report and testimony based upon that examination. Defense counsel then objected to the report and to Dr. Spodak's testimony, explaining as follows:

"MR. KINSLEY [defense attorney]: I would object, Your Honor, not only to that but to the Doctor's testimony. When the State's Attorney requested an order of Court to have Dr. Spodak see the Defendant again on November 27th, the State's Attorney in his requested Order of the Court indicated that counsel for the Defendant had no objection. Indeed, *I had no objection because I was under the impression that Dr. Spodak would see him as a member of the staff of Clifton T. Perkins.*

"I'm mindful of the Court of Appeals ruling that the Clifton T. Perkins staff, a governmental body, employees of the State of Maryland as is Dr. Spodak when he's at Clifton T. Perkins, that they are neutral or should be neutral psychiatrists and other medical personnel. That the Defense in effect has no obligation to employ separate psychiatrists but can accept this puritan view of the psychiatrists employed by the State as is Dr. Spodak, but I have learned subsequent to my agreement that I had no objection to Dr. Spodak seeing the Defendant that he was now in the employee—he was a paid doctor by the State's Attorney's Office.

*"This came to me as a shocking revelation, and had I known it before, I would not have permitted it. I would have been to the Baltimore County Jail and would have advised my client not to discuss any matters with Dr. Spodak so long as he was then in the employ of the State's Attorney's Office,* so I suggest that the alleged agreement by me of this whole proceed-

ing was done without a full candid revelation. That I have been taken so to speak. That the Doctor is no longer a pure objectionist, but is a paid person whose views obviously more than likely reflect the views sought by his employer, Mr. Basham, so I move that his report not be considered and that his testimony be suppressed." (Emphasis added.)

The trial court then gave the prosecution an opportunity to respond or rebut, but the prosecuting attorney stated that he had nothing to say. The court then denied the motion in a ruling which suggested a lack of understanding concerning the nature of defense counsel's objection. The colloquy was as follows:

"THE COURT: Anything from the State?

"MR. BASHAM [prosecuting attorney]: No, Your Honor.

"THE COURT: The Motion will be denied. Dr. Spodak is an eminently qualified Forensic Psychiatrist. He has testified and he knows, not knows but—

"MR. KINSLEY: But all psychiatrists are eminent.

"THE COURT: Excuse me. Would you like me to make my ruling please, sir? He's a qualified Forensic Psychiatrist, and as far as the Court is concerned, it makes no difference who pays him, and he knows it as well as I do. He's a professional person and can give his opinion, and nobody and no amount of money is going to cause him to change his opinion, so the Motion will be denied."

The defendant's attorney again attempted to explain that the basis of his objection to the admissibility of Dr. Spodak's report and testimony was not Dr. Spodak's qualifications or objectivity but was the manner in which the attorney's "consent" was obtained:

"MR. KINSLEY: Well, let me just simply say, I don't think the Court is addressing itself to the nub of my objection, that is, had I known, whether the Court thinks he can be objective or not is immaterial. I say I would

not have permitted any subsequent investigation or any subsequent conversations the Doctor may have had with the Defendant had I known he was in the employ and pay of the State's Attorney's Office.

"THE COURT: Well, you misunderstand what I say. Irrespective of whether you agree or not agree, the Court permitted it on here, so the Motion will be denied, Mr. Kinsley.

"MR. KINSLEY: Well, maybe the Court permitted it because it saw there that I didn't interpose an objection. The document that the Court used as a basis for permitting it was obtained improperly by the State's Attorney's Office.

"THE COURT: All right. I've considered your Motion and denied it again, Mr. Kinsley.

"MR. KINSLEY: Yes, sir.

"THE COURT: All right. Proceed.

"MR. BASHAM: The report then is admitted, Your Honor?

"THE COURT: Yes."

Dr. Spodak went on to testify at length, with the continual objections of defense counsel being overruled. His testimony was devastating to the defense with regard to negating the existence of mitigating circumstances, particularly the statutory mitigating factors of whether the murder was committed while the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired and whether it was unlikely that the defendant would engage in further criminal activity that would constitute a threat to society.[3] For example, Dr.

---

3. Code (1957, 1982 Repl.Vol., 1983 Cum.Supp.), Art. 27, § 413(g)(4) and (7), provide as follows:

"(g) *Consideration of mitigating circumstances.*—If the court or jury finds, beyond a reasonable doubt, that one or more of these aggravating circumstances exist, it shall then consider whether, based upon a preponderance of the evidence, any of the following mitigating circumstances exist:

* * * * * *

Spodak specifically set forth his opinion that, "within a reasonable degree of medical certainty," Thomas would engage in further criminal activities and would be a threat to society. The psychiatrist testified that when he examined Thomas for purposes of the sentencing hearing, Thomas was "more hostile" than he was during the earlier examinations at the Clifton T. Perkins Hospital Center. Dr. Spodak reviewed in detail the grounds for his opinion concerning Thomas's future dangerousness, such as Thomas's prior record of violence, his "poor impulse control," his inability "to delay gratification," his lack of remorse, his inability "to handle environmental stress," etc. While acknowledging that "[t]here has been a lot of debate as to how well psychiatrists can predict dangerousness and violence," Dr. Spodak reiterated his view, with regard to Thomas, that "you can certainly say that there's a very high likelihood" of "future criminal behavior, future dangerousness and future violence." The psychiatrist stated, and later reiterated, that Thomas was not "amenable to treatment." Finally, when asked whether Thomas would engage in future criminal activity if he were incarcerated, Dr. Spodak replied: "I wouldn't want to be his cell mate."

The testimony of Dr. Spodak at the sentencing hearing furnished a principal basis for the prosecuting attorney's arguments against the existence of mitigating circumstances. On the other hand, the defense attorney *inter alia* argued extensively that Thomas's capacity to appreciate the criminality of his conduct or conform his conduct to the law had been impaired and that Thomas was not likely to engage in future criminal activity. The defense attorney

---

"(4) The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder or emotional disturbance.

 \* \* \* \* \* \*

"(7) It is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society."

relied on the earlier report from the Clifton T. Perkins Hospital Center, which he contrasted with Dr. Spodak's later testimony, as well as on other testimony and evidence.

The trial judge, in imposing the death sentence, specifically found that Thomas's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was not substantially impaired and that Thomas "will engage in further criminal activity that would constitute a continuing threat to society." In making both of these findings, the trial judge specifically relied on the testimony of Dr. Spodak at the sentencing hearing. With regard to future criminal activity and dangerousness, Dr. Spodak's testimony at the sentencing hearing was the chief ground for the trial court's finding.

## II.

In light of the above-reviewed facts, it is clear to me that the instant case is controlled by *Estelle v. Smith, supra.*

The issue in *Estelle v. Smith,* as in the present case, was "whether the prosecution's use of psychiatric testimony at the sentencing phase of [defendant's] capital murder trial to establish his future dangerousness violated his constitutional rights." 451 U.S. at 456, 101 S.Ct. at 1869. In *Estelle,* prior to trial, the court ordered the defendant to undergo a psychiatric examination in order to determine his competency to stand trial. It was not clear whether defense counsel was informed of the psychiatric examination before it took place, *id.* at 471 n. 15, 101 S.Ct. at 1877 n. 15, and this question was not treated by the Court as significant. What was significant was that defense counsel was not notified of the scope of the examination, did not consent to the examination, and did not advise the defendant regarding his submission to the examination. *Id.* at 465, 466–468, 471, 101 S.Ct. at 1874, 1875, 1877. In *Estelle* the defendant was found competent to stand trial and, at the first stage of the bifurcated proceedings, was found guilty. Thereafter, at the capital sentencing hearing, the prosecution was permit-

ted over objection to call the psychiatrist as a witness on the issue of " 'whether there is a probability that the defendant would commit criminal acts of· violence that would constitute a continuing threat to society.' " *Id.* at 458, 101 S.Ct. at 1870. The psychiatrist's testimony in *Estelle* was similar to Dr. Spodak's testimony in the instant case regarding the defendant's future dangerousness, amenability to treatment, etc. *Id.* at 459–460, 101 S.Ct. at 1871. Based upon the jury's findings, the defendant in *Estelle* was sentenced to death.

The Supreme Court in *Estelle* held that the admission of the psychiatrist's testimony at the sentencing hearing infringed both the defendant's Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to the assistance of counsel.[4] Regarding the Sixth Amendment right, the Court held that the defendant "was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." 451 U.S. at 471, 101 S.Ct. at 1877. The Court stated "that a defendant should not be forced to resolve such an important issue without 'the guiding hand of counsel.' " *Ibid.*

Although the matter is not at all clear, I shall assume arguendo that *Estelle's* Fifth Amendment holding is not applicable to the facts of the present case. Nevertheless, the defendant Thomas was obviously denied the assistance of counsel in making the decision of whether to submit to Dr. Spodak's examination in connection with the sentencing proceeding. His attorney's "consent" to this examination was induced by the prosecution's deception.[5] But a "con-

---

**4.** It is noteworthy that, while a majority of the Court favored reversal on both grounds, all nine members of the Court believed that the defendant's Sixth Amendment right to counsel had been violated.

**5.** It is axiomatic that silence or nondisclosure may constitute deception or misrepresentation, depending upon the circumstances. *See, e.g., Equitable Co. v. Halsey, Stuart & Co.,* 312 U.S. 410, 424–426, 61 S.Ct. 623, 630, 85 L.Ed. 920 (1941); *Strong v. Repide,* 213 U.S. 419,

sent" induced by misrepresentation is not consent. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968). As Thomas's attorney emphasized to the court below, if he had known that Dr. Spodak's role had changed and that the psychiatrist had become the prosecution's hired expert, "I would not have permitted it. I would have ... advised my client not to discuss any matters with Dr. Spodak."

### III.

The majority's reasons for rejecting Thomas's argument based on *Estelle v. Smith, supra,* will not withstand analysis.

Initially the majority suggests that Thomas's attorney did not in the trial court raise the Sixth Amendment issue which formed the alternate basis for the decision in *Estelle.* But the entire thrust of counsel's objection to Dr. Spodak's report and testimony was that defense counsel was misled into "consenting" and that, had he known of the doctor's role change, he "would have advised [Thomas] not to discuss any matters with Dr. Spodak." This was obviously an objection relating to the right to the assistance of counsel. I am aware of no principle of law requiring that a trial lawyer, in order to preserve an issue, must cite the specific Supreme Court case on point.[6] Moreover, we have indicated that in death penalty cases, we shall consider issues "whether or not properly preserved for review." *Johnson v. State, supra,* 292 Md. at 412 n. 3, 439 A.2d 542.

The majority opinion next attempts to distinguish *Estelle v. Smith* by stating that in Maryland, unlike Texas, the

---

430–433, 29 S.Ct. 521, 524–526, 53 L.Ed. 853 (1909); W. Prosser, *The Law of Torts,* § 106 (4th ed. 1971); F. James and O. Gray, *Misrepresentation,* 37 Md.L.Rev. 488, 524–527 (1978).

**6.** Compare the nature of the objection in *Estelle,* 451 U.S. at 459, 468 n. 12, 101 S.Ct. at 1871, 1876 n. 12.

"State does not bear the burden of proving the nonexistence of mitigating circumstances" and "thus, the appellant's words were not used against him on a matter upon which, as in *Estelle*, the prosecution held the burden of proof."[7] The majority then points out that Dr. Spodak advised Thomas that any information which he revealed could be used at a subsequent capital sentencing hearing. These factors may or may not distinguish the *Estelle* case for purposes of the Fifth Amendment self-incrimination issue. Nevertheless, they are utterly irrelevant to the Sixth Amendment right to counsel issue, and I do not understand that the majority suggests otherwise.

Lastly the majority points out that, unlike the situation in *Estelle*, Thomas's attorney had prior notice of Dr. Spodak's examination for purposes of the sentencing hearing and agreed to it. Of course, this entirely ignores the fact that defense counsel was misled concerning the role of Dr. Spodak. Had defense counsel known that Dr. Spodak's role had changed, he may well have advised Thomas not to submit to the examination.

Because of the prosecution's misleading action in this case, the defendant Thomas was deprived of the assistance of counsel in deciding whether or not to submit to Dr. Spodak's examination in connection with the capital sentencing hearing. Consequently, under *Estelle v. Smith*, Dr. Spodak's report and testimony were improperly admitted at the sentencing hearing. I would vacate Thomas's death sentence and remand for a new sentencing proceeding.

Judge COLE has authorized me to state that he concurs with the views expressed herein.

---

7. In Maryland, however, as shown by the instant case, the prosecution in capital cases typically presents, as an initial matter, evidence to negate mitigating circumstances upon which it believes that the defendant will rely.