613 A.2d 450

**Donald Warren JOHNSON**

v.

**STATE of Maryland.**

No. 1695, Sept. Term, 1991.

Court of Special Appeals of Maryland.

Oct. 2, 1992.

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

David P. Kennedy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Frank R. Weathersbee, State's Atty., for Anne Arundel County of Annapolis, on the brief), for appellee.

Argued before GARRITY, BLOOM and DAVIS, JJ.

DAVIS, Judge.

Donald Warren Johnson, appellant, was convicted by a jury in the Circuit Court for Anne Arundel County, the Honorable Martin A. Wolff presiding, of first degree rape, first degree sexual offense, and lesser included offenses. He was sentenced on November 8, 1991 to a term of twelve years imprisonment for first degree rape and to a concurrent twelve year term for first degree sexual offense. In this appeal, he asks:

1. Did the trial court err in excluding evidence that the prosecutrix "freaked" for crack cocaine?
2. Is the evidence insufficient to sustain the convictions of first and second degree rape, first and second degree sexual offense, and battery?[1]

## FACTUAL BACKGROUND

In the early morning hours of March 9, 1991, according to the 23–year–old prosecutrix, she was raped by appellant and co-defendant Robert Galloway. She had known Galloway and appellant from high school. According to her testimony, she purchased crack cocaine from one of the "regular drug dealers" in Pioneer City on three occasions between the hours of 7 p.m. to midnight on the day in question. She had received $200 in wages from her job at Hardee's Restaurant and had paid her mother $50, using the remaining $150 to purchase crack cocaine. The victim testified that she and her friends drove to Meade Village to obtain more crack cocaine after she had consumed the cocaine purchased earlier in the evening.

After purchasing a "twenty" from Robert Galloway, they drove to a trailer in the country, smoking the cocaine en route to the trailer, and smoking more of the cocaine from the time they arrived until approximately 3:00 a.m.

The victim was driven to the home of a friend, Jack Dailey, in Pioneer City sometime after 3:00 a.m. She obtained $19 from Dailey to obtain more crack cocaine, and he drove her to Meade Village where the victim met a tall, light-skinned man and asked if he knew "where anything was." The victim followed the light-skinned man first to an apartment building, where he knocked on the door to an apartment, and then to the building next door where they met Galloway outside. The victim advised that she wanted

---

1. Appellant refers to the insufficiency of the evidence to sustain a conviction for battery; however, the docket entries and the record indicate the battery conviction was merged by the court into the conviction for first degree rape.

a "twenty" and followed the tall, light-skinned man and Galloway upstairs to a vacant apartment.

The victim testified that, once in the apartment, she was forced into the bedroom by the light-skinned man and told by Galloway to get down "on all fours." She objected that she was not there to "freak" for the crack and had money to pay for it. Galloway "snatched" her pants from her when she objected, then squeezed her wrist until she was forced to her knees. The victim was then forced to perform fellatio on the tall, light-skinned male, while Galloway had vaginal intercourse with her from behind. The two men then switched their positions.

The prosecutrix then testified that she heard a lot of laughing and smelled fumes from the drugs as a third, unidentified man penetrated her vagina while she continued to perform fellatio on Galloway. During these sexual acts, appellant entered the room, pushed Galloway out of the way, and placed his penis in her mouth. Shortly thereafter, he penetrated her vagina from the rear position. As Galloway left the apartment, he offered the victim a bag of crack cocaine that was on the floor and told her that if she went to the police they would tell the police that she was "freaking for crack."

The victim retreated to a nearby laundromat, where she was discovered by Barbara Jackson, the leasing manager of a Pioneer City town house development. Jackson telephoned 911, and the victim was examined that morning at North Arundel Hospital, where no evidence of general or gynecological trauma was found. The hospital records further revealed that her clothing was not found to be damaged, and her emotional state was described as calm.

Appellant gave the police a statement as follows:

I was walking past the building and this guy comes out the building and tells me this girl is freaking. I went in the building and she was naked. She was having sex and I watched and waited for my turn that was it. The first thing she did was she had oral sex with me and while she

was doing that another party was having sex with her. Then I had sex with her and then I left. Her and this guy were fussing about something. She asked me about some drugs and I let her know that I don't [know] what kind of deal they made but I didn't tell her I was going to give her anything. They were discussing it and I left.

Q. Was [the victim] being forced to have sex with anyone?

A. No.

. . . .

Q. Did [the victim] receive any drugs from you or anyone else?

A. She didn't get none from me I don't know about anyone else.

Q. If she came in the room late how do you know she wasn't being forced?

A. Because about what she had said about taking care of all of us. She gave me a can to put some holes in it to smoke some crack but I told her I don't get high I told her I was going to leave.

Q. Did you at any time threaten [the victim] or use force to have sex with her?

A. No.

Q. Why is she saying you raped her?

A. I figure because the other guy didn't give her, her rock.

Galloway told the police:

I was up the street in Meade Village I was walking home and I went the back way I seen this fellow. He and [the victim] were on a step in the back of the house and she was giving him head. He called to me and said hey man where you going and I said I was going home they jumped and stopped doing what they were doing. I kept on going down the street and they followed me. I asked him what she was doing and he said she was trying to do something. I said what she want to do something with I don't got nothing he said don't worry about it I got it.

We went down towards the apartments and went in the apartment and she just started giving head and taking her clothes off nobody forced her. Then she just started freaking. The reason she started freaking was because she thought she had something coming. First it was both of us backthere [sic]. It went on for a little while about five or ten minutes. Then she said where is her peice [sic] at. The guy said don't worry about it I got it and she said ok. She said about five more minutes I'm going to stop bevcause [sic] I want mine. She wasn't really doing nothing for me so I said I was finished. I left and then this dude was out side he asked me what was going on and I said this girl was freaking. I left and went home.

Q. Whey [sic] is [the victim] saying you raped her?

A. The only thing I can say is the reason why is because we didn't give her something.

Q. What was she looking for?

A. She said she was going to freak for some caine.

Q. Have you ever had sex with [the victim] before?

A. No.

Q. Did you force [the victim] to perform fellatio on you?

A. No I didn't.

William Jackson, who was called as a witness for appellant, testified that the victim had asked him if he knew where to get some "rock" when they met on the street. Jackson asserted that the victim told him that she did not have any money but asked him if he wanted some "head" or "p——y." He further asserted that the prosecutrix was performing fellatio on him when Galloway walked past. The victim then followed Jackson to a nearby apartment, where she completed the act of fellatio on Jackson at which time Galloway came into the apartment and "asked can he get his d——k sucked." The victim responded that it would cost a little more rock, whereupon Jackson said that he would take care of everything. The victim then performed

fellatio on Galloway while Jackson penetrated her vagina from the rear. Jackson could not maintain an erection and left. On his way out, Jackson met appellant and told him that there was "a bitch up there freaking." Appellant then went into the apartment building and, despite Jackson's promise to the victim that "everything was taken care of," he left without giving the victim any crack cocaine.

Galloway was walking home, according to his testimony, when he saw the victim giving Jackson "head" behind a house. When Galloway said that he did not have any drugs, Jackson responded that it was "taken care of." According to Galloway's testimony, Jackson and the victim then entered a nearby apartment building where Galloway walked into the apartment a short time later and found the victim on her hands and knees and Jackson penetrating her vagina from the rear. When Galloway asked if he could "get on," the victim told him that it would cost a little more, and Jackson said that he would take care of it. Thereafter, the victim performed fellatio on Galloway, and then appellant entered the apartment and she performed fellatio on him. After Galloway repeated his sexual acts with the victim, he left the apartment and went outside where the victim approached him and asked for her crack cocaine. When they told her that they had not promised to give her anything, the prosecutrix called Galloway a "common bitch" and grabbed a plastic baggie out of his hand. Galloway testified that he had not sold any drugs to the victim or used any force to have sex.

Appellant testified that, on the day in question, he was proceeding down the street when he saw Jackson, Galloway, and the victim. The victim and Jackson entered an apartment building whereupon Galloway said that he was going in to see what was going on. Approximately fifteen minutes later, Jackson came out of the building and told appellant that there was a girl in the building "freaking." When appellant asked "what's up," Jackson told him, "Don't worry about it. It's taken care of. Just go ahead up." When appellant entered the apartment, he found the

victim performing fellatio on Galloway and asked if he could "get on." The victim told him not to worry and that she would "take care of all of you-all." After the victim performed fellatio on Galloway, she performed fellatio on appellant, then appellant had vaginal intercourse with her from the rear. Galloway then left the apartment, and appellant and the victim had "regular sex" and also left the apartment. When the victim asked where the crack cocaine was and where Jackson had gone, Galloway said that he did not know where Jackson had gone, whereupon the victim grabbed a package from Galloway's hands and appellant walked away.

## LEGAL ANALYSIS

### Admissibility of Evidence of Past Sexual Acts

Appellant sought a pretrial ruling on the admissibility of evidence that the prosecutrix "habitually" freaked for cocaine—that is, that she agreed to have sex in exchange for crack cocaine. Testifying out of the presence of the jury, the prosecuting witness admitted that she had "freaked" for crack cocaine for approximately six months, usually in Pioneer City, across the street from Meade Village where the alleged rape occurred. This practice had most recently occurred approximately one week before the incident in question. She further testified that she would engage in sex for crack cocaine at any time of the day or night when she wanted to get high. She had not, however, engaged in sex with appellant or Galloway prior to March 9, 1991, the day of the incident in question.

The lower court ruled that the evidence of the victim's freaking for crack cocaine was inadmissible under the Rape Shield Statute, Md.Ann.Code (1957, 1992 Repl.Vol.) art. 27, § 461A. The court reiterated its ruling before and during the cross-examination of the victim.

Maryland's Rape Shield Statute states, in pertinent part, the following:

(a) *Evidence relating to victim's chastity.* Evidence relating to a victim's reputation for chastity and opinion evidence relating to a victim's chastity are not admissible in any prosecution for commission of a rape or sexual offense in the first or second degree. Evidence of *specific instances* of the victim's prior sexual conduct may be admitted only if the judge finds the evidence is relevant and is material to a fact in issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value, and if the evidence is:

(1) Evidence of the victim's past sexual conduct with the defendant; or

(2) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease, or trauma; or

(3) Evidence which supports a claim that the victim has an ulterior motive in accusing the defendant of the crime; or

(4) Evidence offered for the purpose of impeachment when the prosecutor puts the victim's prior sexual conduct in issue.

(Emphasis added).

In sum, evidence of specific instances of the accuser's sexual history may be admitted *only* when three conditions are met: (1) if one of the above four enumerated exceptions applies; (2) if the court deems the evidence relevant and material; and (3) if the evidence's probative value outweighs its prejudicial nature. A trial court's ruling on the admissibility of such evidence will be overturned on appeal only if appellant can show an abuse of discretion. *Thomas v. State,* 301 Md. 294, 317, 483 A.2d 6 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985). *See also State v. Allewalt,* 308 Md. 89, 101–02, 517 A.2d 741 (1986); *Testerman v. State,* 61 Md.App. 257, 265, 486 A.2d 233 (1985).

Several Maryland cases deal with broad applications of the rape shield statute; however, the narrower question

of the admissibility of evidence that the accuser previously had offered sex in exchange for drugs has been addressed less frequently by Maryland Courts.

In *White v. State*, 324 Md. 626, 598 A.2d 187 (1991), two men were charged with kidnapping, raping, and robbing a woman. The woman claimed that the men drove past as she used a pay phone and asked if she knew where any crack cocaine could be found. When she responded "no," the men drove off but returned, at which time they jumped out, pulled her into the van, and forced her to engage repeatedly in sex. The defendants claimed that they never engaged in sexual acts with the woman and that she filed a false rape complaint in anger because they would not procure more cocaine for her.

The Court of Appeals held that proffered defense testimony that the victim previously had engaged in sex in exchange for drugs was inadmissible under the rape shield statute because it was irrelevant as well as overly prejudicial. At trial, when the lower court refused to admit the testimony, defense counsel proffered that one of its witnesses would have testified that he knew of " 'previous occasions when he has known that [the accuser] has asked people to provide cocaine in return for sex,' " *id.* at 632, 598 A.2d 187, and that " 'he has had instances when she participated in sex with him for drugs.' " *Id.* at 633, 598 A.2d 187.

The defendants contended that their witness's testimony that the woman had a history of trading sex for drugs would fit the third exception to the rape shield statute, which allows evidence of prior sexual conduct if it "supports a claim that the victim has an ulterior motive in accusing the defendant of the crime." The Court held that the lower court properly excluded the proffered evidence because it was irrelevant.

> Her anger was the result of their failure to procure drugs, not their failure to trade drugs for sex. Even adopting the Whites' contention, it was not their declining [the accuser's] offer of sex that motivated the false charge; it was their declining her request for drugs.

Any prior sexual acts or prior sexual solicitations by [the accuser] could have little, if any, relevance to her alleged anger at the Whites. In addition, the fact that [the accuser] may have successfully offered or traded sex for drugs in the past does not tend to show that she would become enraged with the Whites for failing to supply her with drugs and declining her alleged sexual solicitation. Luther Moore's testimony would have *dubious relevance* to establishing that [the accused] had an ulterior motive to lie....

*Id.* at 637, 598 A.2d 187 (emphasis added). The Court further held that, even if the testimony was relevant, admission of the evidence would violate a key aspect of the rape shield statute because the inflammatory nature of the testimony would be such that its prejudicial effect would outweigh its probative value.

What Luther Moore's testimony would do is paint a picture of the victim as an immoral person who sells herself for illegal drugs. In that manner, the Whites might refocus the trial on [the accuser's] character, one of the results that the rape shield statute is meant to guard against.... The testimony in question would have invited the jurors to stray into collateral matters that would have obscured the issues before them. Its probative value, if any, was far outweighed by its prejudicial effect. *Lyba v. State,* 321 Md. 564, 570–71, 583 A.2d 1033, 1036 (1991); *Smallwood v. State,* 320 Md. 300, 307–08, 577 A.2d 356, 359 (1990); *State v. Cox,* 298 Md. 173, 178, 468 A.2d 319, 321 (1983).

*White,* 324 Md. at 638–39, 598 A.2d 187.

The admissibility *vel non* of such evidence has been addressed by the federal appeals courts and by courts of various states. *See United States v. Saunders,* 943 F.2d 388 (4th Cir.1991); *New York v. McNab,* 144 Misc.2d 612, 544 N.Y.S.2d 930 (1989); and *Commonwealth v. Ascolillo,* 405 Mass. 456, 541 N.E.2d 570 (1989). The provisions of rape shield statutes in the various states and jurisdictions

vary greatly, and any possible guidance afforded by these cases from other jurisdictions is minimal at best.

When a constitutional challenge to the prejudicial effect of the rape shield statute is interposed, defendants generally argue that their right of confrontation and due process should receive greater weight than the strong public policy concerns about prejudice to the victim. Despite those arguments, the courts have held consistently that a defendant

has no constitutional right to present irrelevant evidence at trial. Where the probative value of the evidence is outweighed by the State's interest in protecting the rape victim from harassment and humiliation at trial, its exclusion does not violate the defendant's right of confrontation, his right to present an effective defense or his right to due process of law.

*Thomas,* 301 Md. at 318–19, 483 A.2d 6 (citations omitted).

The appellant draws an analogy between the court's treatment of evidence that a victim is or has been a prostitute who engaged in sex for money and evidence that a victim previously has engaged in sex in exchange for drugs. Three cases that address this question are *Demers v. State,* 209 Conn. 143, 547 A.2d 28 (1988); *People v. Slovinski,* 166 Mich.App. 158, 420 N.W.2d 145 (1988); and *State v. Williams,* 21 Ohio St.3d 33, 487 N.E.2d 560 (1986).[2]

---

**2.** In *Demers,* the Court concluded that evidence of the victim's arrest for prostitution would have been relevant to the issue of consent in petitioners' criminal trial, particularly where the arrest report controverted victim's sworn testimony that she was not a hooker and had never engaged in sex for money. *Id.,* 547 A.2d at 36. The Court held: "To have deprived the petitioners of the ability to present such evidence which was so highly probative, relevant and material to an element of the crime charged would have violated their sixth amendment rights under the United States constitution to confront the witnesses against them." *Id.* at 37.

In *Slovinski,* the Court held that proffered evidence (through several witnesses who could identify the woman as a prostitute who frequented a local restaurant) of alleged specific acts of prostitution has a tendency to make it more probable that the complainant entered into a financial arrangement with defendant for sexual acts. *Id.,* 420 N.W.2d at 153–54. The Court reasoned:

Significantly, appellant neither raised below nor argues on this appeal the question of whether the constitutional rights of due process or confrontation must give way to the protections afforded under the rape shield law. Indeed, under the reasoning of *Demers, Slovinski,* and *Williams, supra,* the question of whether the provisions of the rape shield law prevent one from presenting his defense would be squarely before us. That, however, is not what appellant argues. His point, simply put, is that under the third exception, *i.e.,* that the evidence supports a claim that the victim has an ulterior motive in accusing him of the crime, the evidence should have been admitted.

The court, in its written memorandum, reasoned: "Here just because she may have done it in the past, doesn't show me any ulterior motive or it's going to make it safe for her in the community." The court was apparently alluding to appellant's theory that the ulterior motive was to have the "word" go out that anyone who did not live up to their end of the bargain when the victim agreed to exchange sex for drugs would be accused of rape.

The testimony of Jackson, Galloway, and appellant indicated that the victim grabbed a package (ostensibly drugs) from Galloway's hand and walked away. It would logically follow that the complainant would not have vented her ire against the trio if, in fact, she had obtained the drugs, albeit that she had to seize the package from Galloway. She would not have had an ulterior motive to charge assailants if she, in fact, received the drugs as promised. Moreover,

---

The crux of defendant's claim is that because the complainant is an alleged prostitute, she consented to sex with him for money. Without such evidence, defendant would be unable to establish a defense. We recognize the prejudicial impact of such evidence. However, the jury would still be free to disregard two [witnesses'] testimony that the complainant is a prostitute. *Id.* at 154.

In *Williams,* the Court held that refusal to admit evidence of the accuser's reputation as a prostitute, in applying the Rape Shield Statute, violated the defendant's right of confrontation. *Id.,* 487 N.E.2d at 562–63.

under the defense theory of the case, appellant entered the room some time after the agreement was made between the complainant and Jackson to exchange sex for drugs and she told appellant not to worry, that she would "take care of all of you-all."

Of course, under the victim's version of what occurred, it was her assailants who were insisting that she agree to accept the drugs in exchange for sex. She testified:

A. I got up and I had told Bobby that he was common for what he had did. There was a bag of crack thrown on the floor and he told me it was mine. On the way out the door, some man came in and said, "Where's my s—t?"

[DEFENSE COUNSEL]: Objection. Objection, Your Honor, hearsay.

COURT: It's not offered for the truth of the matter. It was something that was said at the time.

Q. You may continue.

A. And some man came in and said where was his s—t, and they said down there on the floor, and he went and picked up the package. Saw him take it. It was his. I don't know. He walked out of the building. I got dressed, walked out of the building, and Bobby in his last words was "You're not going to go to the police, because . . ."

Q. What, if anything, else did he say?

A. He said because you were out here buying crack, and we'll just tell them that you were out here freaking for it.

Assuming, as we must, that the jury credited at least part of the victim's testimony, it would support the proposition that the complainant had an ulterior motive to accuse appellant falsely only insofar as she did not receive the cocaine. Under the complainant's version, however, Jackson, Galloway, and appellant had attempted to give her the cocaine, but it was claimed by the unidentified man before the complainant took possession of it. In view of the confusion regarding who owned the cocaine and the testimony that

the defendants wanted the complainant to have it, logically, she would have had an ulterior motive to accuse the person who took it. In any event, the defense theory of the case is predicated on a scenario under which complainant would have no reason to be enraged at the persons she accused of raping her.

The court, in its memorandum opinion, noted that the prior sexual conduct had not occurred with either defendant, deciding that, consequently, the prior conduct did not bear on the issue of consent. Noting that the prosecuting witness admitted, out of the presence of the jury, to having exchanged sex for drugs over a six month period, the court concluded that the evidence could not be admitted for impeachment purposes. The court finally weighed the probative value versus the prejudicial effect of the evidence and determined, "That I just do not accept. I have to believe that the prejudicial factor is greater than the probative factor as to that."

Only if we determine that the lower court abused its discretion in ruling on the admissibility of the evidence of prior sexual conduct must the conviction be overturned. *Thomas v. State, supra.* The lower court never specifically determined the question of whether the evidence was relevant and material, but rather focused on the question of whether the prejudicial effect outweighed any probative value. Once the court determines that one of the four exceptions enumerated in the rape shield statute applies, the questions of relevancy, materiality, and whether the probative value outweighs the prejudicial nature are still subject to the discretion of the trial judge.

In determining the prejudicial effect of permitting the jury to consider evidence of the victim's previous sexual conduct, the trial judge could properly take into consideration whether the proffered evidence would persuade the jury that the prosecuting witness exchanged sex for drugs on this particular occasion because she was a morally decadent person prone to engaging in this type of activity or whether the jury would properly determine whether the

evidence tended to make it more likely than not that the victim exchanged sex for drugs on this occasion because it had been established that she had done so in the past. While such a distinction requires that a fine line be drawn, instructive is the language in *White v. State, supra*, where the Court of Appeals condemned the admission of evidence designed to cast the victim in the light of an immoral person thereby refocusing the trial on the victim's character, "one of the results that the rape shield statute is meant to guard against." *Id.*, 324 Md. at 638.

The jury had before it the testimony of the prosecuting witness that she consumed crack cocaine from 7 p.m. until midnight on the evening in question and that she had spent $150 of her $200 paycheck from Hardee's Restaurant to buy cocaine. She further admitted that she went out at 3 a.m. in an attempt to obtain more cocaine when she met Galloway and advised him that she wanted a "twenty" expecting to purchase $20 worth of cocaine. Galloway, Jackson, and appellant testified that the victim had told Jackson that she did not have any money but offered him sex in exchange for drugs. The testimony of the two defendants and Jackson further presented to the jury the defense that the sexual activities were consensual because the victim voluntarily engaged in sex expecting to receive drugs in return. We can only conclude from the verdict returned by the jury that they believed the victim when she testified that she told defendant Galloway that she was not there to "freak" for the crack cocaine and that she had money to pay for it. We must further conclude that the jury also believed that force was used by appellant, directly or in complicity with his accomplices, in order to secure the victim's compliance with his demands. We must also conclude that the jury simply did not believe appellant, Galloway, and Jackson when they testified that the victim had led them to believe that she was willing to have sex in exchange for drugs.

Whether the jury may have been more inclined to believe that the victim had consented on this occasion if it had been provided with the evidence that she had exchanged sex for

drugs in the past is problematic, since she made clear that she had never engaged in sexual relations for drugs with the participants in this case. The net effect of admitting the evidence of prior sexual conduct would have been that the proceedings could have been refocused on an inquiry into prior sexual encounters with other partners. The trial judge did not abuse his discretion in concluding that the prejudicial nature outweighed the probative value particularly in view of the great potential that the jury would have viewed the victim simply as a fallen woman and not focused on whether they believed her testimony that she was prepared to pay for the drugs as opposed to the testimony of appellant and Jackson that the understanding was that sex would be exchanged for drugs. Accordingly, we hold that the trial judge's ruling that the inflammatory nature of the excluded evidence required that it not be admitted was a proper exercise of his discretion.

### Insufficiency of the Evidence

Appellant's second contention is that, since he testified he engaged in sexual acts with the victim in the belief that she was "freaking" for drugs and that Jackson had made arrangements for her to receive drugs in exchange for her services, the evidence is insufficient to sustain his conviction because he was operating under the mistaken notion that the prosecuting witness had already consented to having sexual relations when he walked into the apartment and found the victim performing fellatio on Galloway and asked if he could "get on." Notwithstanding that appellant testified that the victim told him not to worry and that she would take care of "you-all," the victim testified that appellant entered the room and pushed Galloway "out of the way" and placed his penis into her mouth, demanding "suck [my] d—k."

Citing *Braun v. State,* 230 Md. 82, 185 A.2d 905 (1962), *Langworthy v. State,* 39 Md.App. 559, 387 A.2d 634 (1978), and W. LaFave & A. Scott, *Criminal Law* 356–60 (1972), appellant specifically asserts that "mistake of fact is a

defense when it negates the existence of a mental state essential to the crime charged." Appellant's argument is flawed for two reasons. Initially, the argument is premised on the assumption that the jury found the testimony of Galloway, Jackson, and appellant credible in asserting that the victim had solicited drugs in exchange for sex. It was within the province of the jury to reject all or part of the testimony offered by the defense and accept the victim's assertions that she told Galloway that she was not there to freak for cocaine but was prepared to pay for it; that Galloway had grabbed her wrist and squeezed it until she fell to her knees; that Galloway pulled the victim's hair back and "completed yanking, and eventually I opened my mouth and began sucking the guy"; and that she was scared, testifying that over in that area "people have gotten killed for less, over a pair of shoes, and I didn't know if they would let me walk out of there or not." None of this testimony is consistent with appellant's argument that the victim had initially consented to having sexual relations with Galloway and the tall, light-complected man.

More importantly, however, appellant would not be justified in relying on his belief that the victim had granted consent to Galloway, Jackson, and the unidentified light-complected man. In order for the sexual act between appellant and the victim to be consensual, that consent would have had to be communicated to appellant directly. In other words, appellant cannot claim to have been the beneficiary of the purported consent granted to one or more of the other participants because, under the victim's version of what transpired, there was no *quid pro quo* between the victim and appellant. Thus, the mistake of fact that he attempts to interpose as a defense could only be a mistake of fact as to whether the victim consented to having sexual relations with him and not as to anyone else. There was therefore credible evidence from which the jury could conclude that the victim did not consent to having sexual relations with any of her assailants and there was indeed

nothing to indicate that consent was granted by the victim to appellant.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.